43955. CHILDS v. THE STATE.
(357 SE2d 48)

WELTNER, Justice.

This is a death penalty case. Appellant, Johnnie B. Childs, was indicted in Wilcox County on two counts of murder and one count each of burglary, rape, kidnapping with bodily injury, possession of a firearm by a convicted felon, and escape. Childs pled guilty to the

latter two counts, and was convicted by a jury on all of the remaining counts. He was sentenced to death for each of the murders.[1]

## Facts

Childs married Sharon Hill Childs on February 28, 1984. Sometime in late September or early October of that year, the wife left the defendant and moved in with her mother.

The defendant tried unsuccessfully to persuade his wife to return to him. However, after talking to her by telephone on the evening of October 25, 1984, the defendant "made up" his mind that he was going to kill his wife and James Earl Bailey, whom Childs suspected of having an affair with his wife.

Childs appeared at Sharon's mother's house, and, when Sharon answered the door, took her by her arm and put her into his car. They drove around for a few minutes, and, on his urging, she agreed to return to him. However, because she needed some clothes from her mother's house, they returned there. He waited outside, and Sharon entered the house and locked the doors. (Her mother was not at home.)

Childs took a pair of pliers from his car and pried the screen off one of the windows of the house. He climbed inside, caught Sharon, and forced her back into his car.

Childs drove outside of town to an isolated area. He stated that he put his gun on the "back floorboard" and they "made love" on the back seat of the car. Afterwards, they exited the car, and he shot her as she pleaded, "Don't do it, don't do it."

Childs stated: "I shot her in the arm or shoulder the first time . . . [She] spun around holding her shoulder and I shot her in the head while she was facing me . . . When she fell, I walked around her and shot her in the leg. Then I walked back around her and shot her in the head again."

Childs reloaded his pistol, lit a cigarette, and returned to town. He went to the Half Moon Cafe, where he had shot and killed a man seven years earlier, and observed James Earl Bailey seated outside, in the company of two other men. Childs pulled out his gun and fired at Bailey. The first shot missed, but the next two did not. He shot Bailey once more in the head, as Bailey lay on the ground. Childs told a bystander, "I just did what I wanted to do."

---

[1] The defendant was sentenced to death on May 8, 1985. The defendant timely filed a motion for new trial which was denied September 3, 1986. A notice of appeal was filed September 15, 1986, and the record was filed in this court on October 9, 1986. The case was argued orally January 5, 1987.

## Enumerations of Error

1. First, Childs argues that the trial court should have granted his motion for severance.

The crimes charged here were not of such an unrelated character as to entitle Childs to a severance as a matter of right. See *Gober v. State*, 247 Ga. 652 (1) (278 SE2d 386) (1981). Rather, the question of severance here addressed itself to the trial court's sound exercise of discretion.

The two murders, the rape, the kidnapping with bodily injury, and the burglary were all such integral parts of the defendant's conduct on October 26, 1984, that the state hardly could have presented a case on any of the crimes without presenting evidence of the other crimes. The court did not abuse its discretion by refusing to order these charges tried separately.

The denial of severance did not force Childs to plead guilty to avoid the introduction of evidence of escape and of possession of a firearm by a convicted felon. Evidence that the defendant escaped from the Wilcox County jail while being held on the other charges in this case would have been admissible whether or not a severance was granted as to this offense, see *Quick v. State*, 256 Ga. 780 (5) (353 SE2d 497) (1987), and an appropriate procedure for trying a possession-of-a-firearm count is set forth in *Head v. State*, 253 Ga. 429 (322 SE2d 228) (1984).

2. Second, Childs contends that his motion for change of venue should have been granted. We disagree. Of 95 prospective jurors who underwent a voir dire examination, 48 were excused for cause. However, less than half of these 48 prospective jurors (and less than a fourth of the total) were excused as a result of publicity-related bias, prejudice, or fixed opinion. Most were excused because of their attitudes for or against the death penalty, or for physical reasons. The jury selection process does not show actual prejudice to a degree that rendered a fair trial impossible, and Childs has not shown otherwise that the trial setting was inherently prejudicial. See *Chancey v. State*, 256 Ga. 415 (5) (349 SE2d 717) (1986).

3. After Childs shot James Earl Bailey, he drove to the police station to surrender himself. Police Chief Ray Bloodsworth was the only police officer on duty, and because he had been called to the Half Moon Cafe to respond to the reported shooting, the station was empty. The defendant stated: "I walked back to where the ambulance service was. I saw . . . Annie Ruth . . . back there . . . I told [her] that I had come for the police to lock me up because I had just killed somebody. Annie Ruth told me to go on and get out of there, that I was crazy. She said I hadn't killed anybody. I walked in the [city] clerk's office and asked a woman in there where was the police. I told

her I had killed two people. She called [Chief Bloodsworth] on the radio . . . I told her I had some more bullets in my pocket and I took them out and gave them to her. The woman told me to wait there. I told her I wasn't going anywhere."

The clerk for the City of Rochelle, Georgia, Jean Greene, testified that, although she was not a police officer and had no training as such, she did "have occasion," during the day, to dispatch the police to scenes of reported crimes. On this day, she dispatched Chief Bloodsworth to the Half Moon Cafe with information that someone had been shot. A few minutes later, Greene testified, Childs "came into the City Hall and told me that he was the one that done it . . . and I said, what? And he said, I'm the one that done it, and I said, Oh, you are? And he said, Yeah." So she called Chief Bloodsworth and told him the person who had done the shooting was at the City Hall. Chief Bloodsworth told her to hold him.

Childs heard the Chief tell Greene to hold him, and responded, "You hadn't got to hold me, I'm not going anywhere," and then, Greene testified, "he took out some bullets . . . put [them] on the counter and told me to go get the gun if I wanted it, it was in the car. So, after that I asked him, I — I thought that he was probably — that there had been an accident since he had come in and turned himself in, and I asked him what happened . . . And he said I just done what I wanted to do . . . Now I'll go back where I came from. And so I started to ask him where he had came from and then I happened to — I said, have you been in prison? And he said, Yeah. And I said, What were you in prison for. He said, shooting a man, said, Now I've got two more." Greene testified that she asked Childs whom he had shot, because she had not known until then that a second person had been shot. Childs told her that Sharon was "laying [sic] out there in the woods close to Newt Hudson's dead," and that he had killed her.

Greene testified that she was about 5′ 4″, was not armed, did not attempt to handcuff the defendant, and would not have tried to stop him if he had tried to leave.

(a) In his fourth enumeration of error, Childs argues that his statements to the city clerk were elicited in violation of *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and, on his objection, should have been excluded.

We do not agree. The standards of *Miranda* come into play when the defendant is subjected to custodial interrogation by law enforcement officers. See *Ross v. State*, 254 Ga. 22, 26-27 (fn. 5) (326 SE2d 194) (1985).

Ms. Greene, although involved to some extent with dispatching police officers in the City of Rochelle, was not a police officer, and had no law enforcement authority.

Moreover, Ms. Greene took no overt action to detain the defendant (and would not have done so). The issue of custody involves an objective standard: Would a reasonable person in the defendant's situation have believed that he was physically deprived of his freedom of action in any significant way? If not, he is not subject to the compulsive atmosphere of an actual arrest, and *Miranda* does not apply. See *People v. Lopez*, 163 Cal. App. 3d 602, 608-609, 209 Cal. Rptr. 575 (Cal. Ct. App. 1985).

In the circumstances of this case, Childs could not have believed reasonably that an unarmed, non-uniformed city clerk was a law enforcement officer, or that he was in her custody. See *Berkemer v. McCarty*, 468 U. S. 420 (III) (104 SC 3138, 82 LE2d 317) (1984).

(b) Childs additionally argues that Greene's testimony violated OCGA § 17-7-210, because the state failed to furnish Child's statements to the defense at least 10 days prior to trial. However, Greene testified to no statements given by the defendant "while in police custody," and OCGA § 17-7-210 therefore does not apply.

(c) Finally, Childs argues here, and in his 16th enumeration of error, that the statements should not have been admitted because the references to his prior conviction were irrelevant and prejudicial.

Unless the defendant himself decides to make it so, his character is not an issue at the guilt-innocence phase of a trial. However, evidence otherwise relevant is not inadmissible simply because it reflects adversely upon his character. *Felker v. State*, 252 Ga. 351, 365 (314 SE2d 621) (1984).

Here, as in *Robinson v. State*, 246 Ga. 469 (2) (271 SE2d 786) (1980), the defendant's statement referring to a previous killing tended to establish his motive for committing the killing, and, as well, to explain his state of mind at the time of the commission of the offense.

We find no impermissible injection of character evidence.

4. When Chief Bloodsworth arrived at the city hall, Childs told him the gun he used was on the front seat of his car. Chief Bloodsworth looked into the car, observed a gun lying on the front seat, and seized it.

Childs argues that because the discovery of the gun was not "inadvertent," its seizure was not justified under the "plain view doctrine." See *Coolidge v. New Hampshire*, 403 U. S. 443 (91 SC 2022, 29 LE2d 564) (1971). "But the case sub judice does not involve the 'plain view doctrine' insofar as that concept involves the premise of an initial intrusion." *Speight v. State*, 159 Ga. App. 5, 7 (282 SE2d 651) (1981). Here, what the officer saw in "plain view" from outside the defendant's automobile corroborated what the defendant had told him, and justified the intrusion into the automobile, and the seizure of the gun. *Speight v. State*, supra. See also *Catchings v. State*, 256

Ga. 241 (4) (247 SE2d 572) (1986).

5. In his 5th and 6th enumerations, Childs complains of the trial court's refusal to grant him funds for an independent defense psychiatrist. He contends that he established his entitlement to a psychiatrist under *Ake v. Oklahoma*, 470 U. S. ___ (105 SC 1087, 84 LE2d 53) (1985), and that the lack of such assistance deprived him of a reliable determination of guilt, of sentence, and of his mental capacity to waive his *Miranda* rights.

Childs offered testimony that, shortly after his arrest, he was seen dancing in his cell while listening to a loud radio, and that after he learned the state was seeking the death penalty against him, he cut his wrist. The sheriff testified that the cut was not very deep and required no stitches; that it "wasn't the kind of cutting that you could die from or be seriously injured from."

On February 27, 1985 (after he cut his wrist) Childs was evaluated by Dr. Jerold S. Lower, Ph.D., J.D., at the Wilcox County Jail. His report, in pertinent part, states as follows:

"Throughout our contact with him, Mr. Childs was alert, cooperative, and in good contact with reality. His conversation was clear, logical, coherent, and relevant. He was able to give a coherent account of the events which led to his arrest.

"Mr. Childs is well aware of the nature of his charges, the possible penalties, the pleas and strategies open to him, the mechanics of the proceedings he faces in the courtroom, and the behavior which will be required of him in the situation. We see no reason why he cannot participate in his trial and in the preparation of his defense.

"Mr. Childs displays an intellectual endowment which is distinctly below average. Test scores would place his functioning at approximately the junction between the borderline range and the mildly retarded range of intelligence. However, we know of no evidence that he has any particular deficits in his day-to-day adaptive functioning and therefore we would decline to diagnose mental retardation. It is likely that his test scores are somewhat depressed by a poor educational and cultural background. In addition, he displays signs of a personality disorder characterized by impulsive behavior, disregard for social mores, poor tolerance for frustration, and the like. He also reports a history of substance abuse.

"Despite the above conditions, Mr. Childs does not display signs of a mental illness which would interfere with his ability to distinguish right from wrong, with respect to the acts charged, nor is there evidence of delusional compulsion. The only factor of which we are aware, which would have interfered with his ability to appreciate the criminality of the alleged conduct, was his self-reported ingestion of several unprescribed substances shortly before the alleged crimes. From a psychiatric point of view we have no particular recommenda-

tions for disposition."

A capital defendant must be provided psychiatric assistance if he can show that insanity will be a significant issue at trial. *Ake v. Oklahoma*, supra; *Lindsey v. State*, 254 Ga. 444 (330 SE2d 563) (1985).

The circumstances presented to the trial court did not establish that insanity would be a significant issue at trial. The court did not abuse its discretion by refusing to provide funds for psychiatric assistance. We note that a correctional psychologist testified on behalf of the defendant at the sentencing phase of the trial, on the issue of the defendant's future dangerousness. (He testified that, although Childs could not function in a non-violent manner in the community, "in the prison system he is not a problem.")

The defendant's lack of an independent psychiatrist did not impair the hearing on the question of the voluntariness of the confession. *Sinns v. State*, 248 Ga. 385 (283 SE2d 479) (1981). See also *Colorado v. Connelly*, 479 U. S. ___ (107 SC 515, 93 LE2d 473) (1986).

6. In his 7th and 8th enumerations, Childs contends the trial judge improperly restricted the jury voir dire, and asked too many questions himself. We note that the voir dire proceedings fill almost 1200 pages of the trial transcript — twice as many as the trial itself (guilt and sentencing phases combined). "While some of the questions excluded by the trial court, if minutely parsed and rigorously analyzed, arguably could have been allowed, nonetheless, the questions that were allowed were more than ample to allow the discovery of bias, prejudice and prior opinion." *Curry v. State*, 255 Ga. 215, 218 (336 SE2d 762) (1985). We find no abuse of discretion in the trial court's conduct of the jury voir dire.

7. In his 9th enumeration, Childs contends the trial court erred by failing to excuse for cause 18 prospective jurors who were biased in favor of the death penalty. See *Pope v. State*, 256 Ga. 195 (7e) (345 SE2d 831) (1986). Of these 18 prospective jurors, 10 were not challenged for cause by the defense, and the challenge to another was only on physical grounds (the juror was hard of hearing). The trial court did not err by failing to excuse these 11 prospective jurors, sua sponte, for bias in favor of capital punishment.

The trial court overruled the defendant's challenges to the remaining seven, finding they were qualified jurors under the standard of *Wainwright v. Witt*, 469 U. S. ___ (105 SC 844, 83 LE2d 841) (1985).

The trial court recognized that an inability fairly to consider a life sentence is just as disqualifying as an inability fairly to consider a death sentence. The court excused two jurors biased in favor of the death sentence. In contrast to the situation in *Pope v. State*, supra, the court's findings in this case are "within the deference due the trial

judge's determination." *Jefferson v. State,* 256 Ga. 821, 824 (353 SE2d 468) (1987). We find no error.

8. Next, Childs argues that the trial court should have excused all jurors who admitted having formed and expressed an opinion regarding the guilt or innocence of the accused, whether or not the opinion was fixed, and whether or not the court felt the juror could lay aside his opinion and decide the issues upon the evidence presented at trial.

As the defendant notes, OCGA § 15-12-164 provides: "(a) On voir dire examination in a felony trial, the jurors shall be asked the following questions [including]: (1) 'Have you, for any reason, formed and expressed any opinion in regard to the guilt or innocence of the accused?' " Childs argues that a "yes" answer to this question requires the automatic excusal of the juror.

We disagree. Notwithstanding a 1979 statutory change to the wording of the question, see Ga. L. 1979, p. 1047, § 1, the test for disqualification remains: " 'When a prospective juror has formed an opinion based on hearsay (as opposed to being based on his having seen the crime committed or having heard the testimony under oath), to disqualify such individual as a juror on the ground that he has formed an opinion on the guilt or innocence of a defendant, the opinion must be so fixed and definite that it would not be changed by the evidence or charge of the court upon the trial of the case.' [Cits.]" *Waters v. State,* 248 Ga. 355, 362 (283 SE2d 238) (1981).

The trial court did not err in the qualification rulings at issue here.

9. In his 11th enumeration, the defendant contends the trial court erred by overruling his challenge to a prospective juror who testified that he belonged to an organization that did not admit blacks, and that he did not believe in interracial religious worship. He testified, however, that a "person is innocent until he is proven guilty regardless of race . . . And according to the evidence presented to me, providing that I am selected as a juror, that . . . will be what I base my decision on."

The trial court stated: "The court feels that he will be fairminded and impartial and that he's just an exceptional, conscientious person. That's the impression the court has, and I'm going to leave him on the panel." We find no error.

10. In his final attack on the jury selection proceedings, Childs complains (1) that his "carefully planned" strategy regarding the use of his peremptory challenges was disrupted when the court waited until after the jury was selected to excuse a juror whose wife was ill, and (2) that the jury was not composed of 12 impartial jurors because two of them were married to each other.

The juror whose wife was ill had stated during voir dire that arrangements could be made to take care of his wife. However, his

planned arrangement was that his daughter-in-law would take care of his wife, and this plan was upset when his daughter-in-law was also selected as a juror in this case.

The circumstances here do not establish reversible error. Rather, they illustrate, once again, the necessity for adequate alternate jurors.

As for the presence on the jury of a husband and wife, Childs cites no authority for his assertion that a juror is not impartial simply because the juror's spouse also is on the jury. We find no error here.

11. In his 13th enumeration, Childs contends the trial court abused its discretion by allowing the sheriff to remain in the courtroom during the trial even though he was an important prosecution witness and the rule of sequestration had been invoked.

"It has been repeatedly held that it is within the discretion of the trial judge to permit a witness to remain in the courtroom to assist either the State or the accused." *Benton v. State*, 9 Ga. App. 291 (6) (71 SE 8) (1911). Generally, this discretion should be exercised only if the party requesting the exception can demonstrate a need for the presence of the witness. See, e.g., *Montos v. State*, 212 Ga. 764 (3) (95 SE2d 792) (1956); *Stuart v. State*, 123 Ga. App. 311 (1) (180 SE2d 581) (1971). See also *McGruder v. State*, 213 Ga. 254 (9) (98 SE2d 564) (1957).

However, the sheriff is an officer of the court, and may be excepted from the rule on the court's own initiative. See *Allen v. State*, 235 Ga. 709 (8) (221 SE2d 405) (1975); *Cornett v. State*, 218 Ga. 405 (2) (128 SE2d 317) (1962); *Hoxie v. State*, 114 Ga. 19 (8) (39 SE 944) (1901); *Turbaville v. State*, 58 Ga. 545 (1) (1877); *Jones v. State*, 135 Ga. App. 893 (6) (219 SE2d 585) (1975); *Caito v. State*, 130 Ga. App. 831 (7) (204 SE2d 765) (1974); *Childers v. State*, 130 Ga. App. 555 (2) (203 SE2d 874) (1974); *Askew v. State*, 3 Ga. App. 79 (3) (59 SE 311) (1907).

Thus, we need not evaluate the state's asserted need for the assistance of the sheriff, as a demonstration of such was unnecessary to the court's exercise of discretion.

12. Next Childs argues that he may not be convicted of both burglary *and* kidnapping with bodily injury where the offense of kidnapping is an underlying felony of the offense of burglary. See *Thomas v. State*, 256 Ga. 170 (3) (345 SE2d 594) (1986) (felony murder and underlying felony merge); *Allen v. State*, 233 Ga. 200 (3) (210 SE2d 680) (1974) (conviction of kidnapping with bodily injury cannot stand where rape is the bodily injury and defendant separately convicted of rape).

However, "to complete the crime of burglary, it is not necessary that a defendant actually commit a theft [or a felony]; it is sufficient if he enters without authority and with the intent to commit a theft or a felony. [Cits.]" *Roberts v. State*, 252 Ga. 227, 241 (314 SE2d 83)

(1984).

The offense of burglary was completed when the defendant entered or remained in his wife's house with the *intent* to commit the offense of kidnapping, and it was not necessary to the burglary charge to prove that he actually *committed* the offense of kidnapping. Hence, the offense of kidnapping was not included in the offense of burglary as a matter of fact or of law. He therefore was convicted properly of both offenses. *Palmer v. State,* 174 Ga. App. 720 (331 SE2d 77) (1985).

13. Enumerations 15 and 25 are answered in Division 1 of this opinion.

14. We have already dealt with most of Child's 16th enumeration of error. See Division 3 (c), supra. He also complains of Chief Bloodsworth's testimony that the defendant was on parole. Chief Bloodsworth was attempting to describe his intercession between Childs and his wife during a heated dispute a week prior to her death, and he testified, among other things, that he warned the defendant "to let her go home, that he knew he was on parole and he would just get in trouble. . . ."

The state was authorized to present evidence of previous difficulties between the defendant and the victim. *Cooper v. State,* 256 Ga. 234 (1) (347 SE2d 553) (1986). Any error in the unsolicited reference to parole by Chief Bloodsworth was rendered harmless by the trial court's curative instructions.

15. In enumeration 17, the defendant claims the evidence was not sufficient to support his conviction for burglary, in that it does not show that he entered his wife's home intending to commit the felony of kidnapping. We do not agree. The jury was authorized to conclude from the evidence in this case that the defendant broke into the home with the intent to "abduct" her. OCGA § 16-5-40 (a).

Nor can we agree the evidence fails to establish that the victim was raped. The defendant kidnapped his wife, drove her to an isolated area, and with a gun close at hand, he, in his words, "made love" to her. The jury was authorized to conclude that she did not "consent" to this act of sexual intercourse. *Warren v. State,* 255 Ga. 151 (336 SE2d 221) (1985); *J. B. v. State,* 171 Ga. App. 373 (319 SE2d 465) (1984).

The evidence supports the jury's verdict of guilty on all counts. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

16. The trial court did not err by refusing to charge on voluntary manslaughter. *Brennon v. State,* 253 Ga. 240 (1) (319 SE2d 841) (1984). Enumeration 18 is without merit.

17. The trial court charged the jury that "a person commits the offense of burglary when, without authority and with intent to commit a felony or theft therein, he enters the dwelling house of another

or enters any other building or any room or any part thereof." Childs argued that the trial court erred by charging that the crime of burglary can be committed in more than one manner, i.e., with the intent "to commit a felony *or theft* therein," when the indictment charged, and the evidence showed, an entry "with intent to commit a *felony* [i.e., kidnapping] . . . therein." See OCGA § 16-7-1 (defining the offense of burglary).

It is "not usually cause for a new trial that an entire Code section is given . . . even though a part of the charge may be inapplicable under the facts in evidence." *Keller v. State*, 245 Ga. 522 (1) (265 SE2d 813) (1980). However, it is error "to charge [the jury] that a crime may be committed by either of two methods, when the indictment charges it was committed by one specific method." *Walker v. State*, 146 Ga. App. 237, 240 (246 SE2d 206) (1978). If there is a reasonable possibility that the jury convicted the defendant of the commission of a crime in a manner not charged in the indictment, then the conviction is defective "because of a fatal variance between the proof at trial and the indictment returned by the grand jury." *Lumpkin v. State*, 249 Ga. 834, 836 (295 SE2d 86) (1982). See also, e.g., *Welch v. State*, 254 Ga. 603 (1) (331 SE2d 573) (1985).

In this case, the lack of any evidence or contention that Childs entered or remained in his wife's home with the intent to commit a theft therein eliminates any reasonable probability that the jury convicted him of the commission of this type burglary (i.e., with an intent to commit theft). Any possible error resulting from the trial court's inclusion of the extraneous words, "or theft," is harmless beyond a reasonable doubt.

18. After the charge of the court at the guilt-innocence phase of the trial, the court conducted a conference outside the presence of the jury, as contemplated by Rule III (A) (3) of the Unified Appeal Procedure. See 252 Ga. A-13, A-23. The discussion of subpart (c) thereof proceeded as follows:

"THE COURT: All Right. The court shall give the defendant an opportunity to state any objections he may have to defense counsel or to the manner in which defense counsel has conducted or is conducting the case. And I will ask Mr. Childs at this point, do you have any objection to your lawyers, to defense counsel?

"(Defendant confers with counsel Wheeler)

"MR. WHEELER: Your Honor, I'm not sure what the law is in this particular area. After the attorney or the — both attorneys for the state had argued, we took a brief recess. I'm sure the record will reflect that, and during that recess my client told me that he wanted to testify. I told him that it was late, that the counsel having already argued that it was too late. I believe that's a correct statement of the law. I don't know for sure. I went into — briefly into what he wanted

to state to the jury, and at that time it seemed to me to be ill advised anyway, and so I advised — I advised him that he could not at that point make a statement to the jury, and, uh, that at any rate that the statement would not help us in any way and that it should not be made. I don't — I may have misadvised him about the law, I don't know. But my understanding is — and maybe perhaps I should have moved to reopen the evidence, but it would have, the state having already given their argument and everything, I was of the opinion that it could not be done. I believe that's his only — Is that your only objection, Mr. Childs?

"DEFENDANT: Yes, sir.

"MR. WHEELER: Do you have some question about that?

"DEFENDANT: No, sir.

"THE COURT: Let me ask this, Mr. Childs. Do you have any objections to defense counsel?

"DEFENDANT: No, sir.

"THE COURT: Do you have any objections to the way in which defense counsel have conducted the case or are now conducting your defense?

"DEFENDANT: On the objection, uh, that — that he just mentioned to you.

"THE COURT: Only the thing that you would liked to have made — that you would liked to have testified before the jury and that that came too late, is that what you're saying?

"DEFENDANT: Yes, sir.

"THE COURT: All right. And that came at the time Mr. Wheeler testified about — told me about, is that correct?

"MR. WHEELER: Yes, Your Honor. That — that happened during — well, after [the District Attorney] had completed his argument and during the recess, there was a ten-minute recess in there, and we discussed the case at that time. That's when that occurred.

"THE COURT: Okay. Is that correct, Mr. Childs?

"DEFENDANT: Yes, sir.

"THE COURT: Okay. Very well. The court rules that as a matter of law that was too late after [the District Attorney] had made his argument to the jury; that was legally too late for the defendant to have testified. All right. I believe that completed the Unified Appeal part."

The question of the defendant testifying arose again at the sentencing phase of the trial, when the defendant indicated that he would like to "say something to the jury." The defense attorney stated that he would "like to have time to talk with him further before he does that." The court denied an overnight continuance, but granted a 15 minute recess. Upon the resumption of the proceedings, the defense rested, without offering the defendant's testimony.

In his 20th enumeration of error, Childs contends the trial court's rulings rendered his "fundamental right to testify a nullity," and denied him "any meaningful opportunity to confront the case against him."

As the state now concedes, the trial court did misstate the law at the guilt phase of the trial. "It is well-established that the matter of re-opening the evidence is within the sound discretion of the trial court. [Cit.]" *Castell v. State*, 250 Ga. 776, 791 (301 SE2d 234) (1983). We have held that, even after jury deliberations have begun, the trial court, in the sound exercise of discretion, may reopen the evidence and allow the admission of new evidence. *State v. Roberts*, 247 Ga. 456 (277 SE2d 644) (1981).

Nonetheless, harm as well as error must be shown to warrant reversal on appeal, even in a death penalty case.

The defendant here simply was not prejudiced by the court's extraneous and unsolicited comments about re-opening the evidence. As no motion was made to re-open the evidence, the trial court was not called upon to exercise its discretion.

The defendant did not testify at the sentencing phase of the trial either, on the advice of his attorney. The 15 minute recess granted by the court was not insufficient, and the court's refusal to grant an overnight recess did not deprive the defendant of his right to testify.

We find no reversible error.

19. Next, Childs contends the trial court improperly limited his presentation of mitigating evidence at the sentencing phase of the trial.

(a) In the first instance, the defendant asked a former employee in the prison system, "Do you have any idea if [the defendant] was sentenced to time in prison what prison he would be sent to?" The state's objection to this question was sustained. (The witness did testify about her experience counseling the defendant during his previous incarceration and expressed her opinion that, based on his previous good conduct while in prison, he would adapt well to prison life and would not pose a danger to the other inmates.)

Childs contends that the answer to the question excluded by the trial court would have been that, because of his prior record and the seriousness of the crimes of which he was convicted in this case, Childs would now be sent to a maximum security prison. This answer, he argues, would have been relevant to the issue of future dangerousness, and was improperly excluded. See, e.g., *Walker v. State*, 254 Ga. 149, 159 (327 SE2d 475) (1985).

However, the next witness, a prison warden, was allowed to testify that the defendant would serve any prison sentence in a maximum security institution.

Assuming, without deciding, that the first witness was competent

to express the opinion the defendant attempted to elicit, and that such an opinion was relevant, the testimony the defendant sought was eventually admitted notwithstanding the trial court's initial ruling, and no reversible error occurred.

(b) In the second instance, a retired railroad worker and part-time police officer unrelated to the defendant was called as a defense witness to testify that, insofar as he "knows of," aside from the three instances in which the defendant killed someone, he did not have a reputation in the community for being a "violent person" or a "troublemaker."

Then the defense asked, "Do you feel that [the defendant] ought to get the death penalty in this case?" The state's objection to this question was sustained.

The defendant made an offer of proof outside the presence of the jury that the witness would answer the question: "Well, my answer would be no."

Twice previously we have held that the trial court erred by refusing to allow a defense witness to ask for mercy on behalf of the defendant. *Romine v. State*, 251 Ga. 208 (11) (305 SE2d 93) (1983); *Cofield v. State*, 247 Ga. 98 (7) (274 SE2d 530) (1981). The state argues that the rule of these cases is limited to *relatives* of the defendant, and therefore does not apply here. We cannot agree. In *Cofield*, we referred to "*people* in the community who love him." Id. at 112. (Emphasis supplied.) And in the checklist to the Unified Appeal Procedure, these cases are summarized as holding: "Testimony by *friend* or relative expressing love or affection for the defendant and a desire that the defendant not receive the death penalty is relevant to sentence." Unified Appeal Procedure checklist, Section III (2) (b), 252 Ga. at A-46. (Emphasis supplied.)

However, although a defendant may present witnesses who know and care for him and are willing on that basis to ask for mercy on his behalf, a defendant may not present witnesses to testify merely to their religious or philosophical attitudes about the death penalty. *Franklin v. State*, 245 Ga. 141 (7) (263 SE2d 666) (1980). Nor is a defendant entitled to present the opinion of a witness about what verdict the jury "ought" to reach.

It was not shown in this case that the proffered witness was a friend of the defendant, or even knew him (as opposed to knowing *of* him). From all that appears in this record, the witness was attempting merely to express his personal opinion concerning the death penalty.

We note that several other defense witnesses were allowed to ask for mercy on the defendant's behalf. We find no reversible error here.

20. The court did not err by refusing to answer the jury's questions about parole. *Davis v. State*, 255 Ga. 598 (25) (340 SE2d 869) (1986). In particular, the trial court did not err by refusing to tell the

jury that it could make a non-binding recommendation of life without parole. See *Quick v. State*, 256 Ga., supra at (9).

21. After trial, the defendant raised for the first time an issue under *Batson v. Kentucky*, 476 U. S. __ (106 SC 1712, 90 LE2d 69) (1986), contending the prosecutor exercised his peremptory challenges in a racially discriminatory manner.

A *Batson* issue must be raised in a timely manner, and *after* trial is too late. We note that the record does not show how many blacks were on the venire, nor how many were struck peremptorily by the state.

22. The defendant's 30th enumeration is answered by *McCleskey v. Kemp*, __ U. S. __ (__ SC __, __ LE2d __) (Case No. 84-6811, decided April 22, 1987).

23. In his 28th enumeration, the defendant complains of prosecutorial misconduct. Some of these allegations have been treated earlier in this opinion. Many of the instances cited simply do not amount to misconduct. Others, including those involving the state's closing arguments, were not objected to in a timely manner. "To the extent that the prosecutor may have overstepped his bounds, he did not do so to an extent that resulted in reversible error. [Cit.]" 255 Ga., supra at 610.

### Sentence Review

24. With respect to the murder of Sharon Hill Childs, the jury found as statutory aggravating circumstances that her murder was committed while the defendant was engaged in the commission of rape, kidnapping with bodily injury and burglary, and that the murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture and depravity of mind. See OCGA § 17-10-30 (b) (2) and (b) (7).

With respect to the murder of James Earl Bailey, the jury found as a statutory aggravating circumstance that the crime was committed by "a person with a prior record of conviction for a capital felony, to-wit: The prior conviction for the murder of Sharon Hill Childs." See OCGA § 17-10-30 (b) (1).

(a) In his 22nd enumeration, the defendant contends that it was improper to use the conviction for the murder of Sharon Childs as the sole statutory aggravating circumstance supporting the death sentence for the murder of James Bailey. We disagree. "[I]n deciding if the . . . appellant has a 'prior record of conviction for a capital felony' the jury should consider his record . . . as of the time of sentencing. To conclude otherwise would produce the intolerable result that an offender with no prior record could commit numerous separate murders one after the other before being apprehended, and then, at

the trials for those murders, could *never* receive death under this aggravating circumstance even though convicted of each and every one of the murders." *Stephens v. Hopper*, 241 Ga. 596, 603 (4) (247 SE2d 92) (1978). See also *Peek v. State*, 239 Ga. 422, 429 (6) (238 SE2d 12) (1977).

(b) Contrary to the defendant's 23rd enumeration, the evidence supports the jury's § b (7) finding. See *Phillips v. State*, 250 Ga. 336 (6) (297 SE2d 217) (1982); *Hance v. State*, 245 Ga. 856 (3) (268 SE2d 339) (1980).

(c) The evidence supports the jury's § b (2) findings that the murder of Sharon Hill Childs was committed while the defendant was engaged in the commission of the offenses of rape, kidnapping with bodily injury, and burglary. Enumeration 24 is without merit.

25. The death sentence in this case was not imposed under the influence of passion, prejudice, or other arbitrary factor, and is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Blanks v. State*, 254 Ga. 420 (330 SE2d 575) (1985); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 303 (298 SE2d 1) (1982); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Burden v. State*, 250 Ga. 313 (297 SE2d 242) (1982); *Mathis v. State*, 249 Ga. 454 (291 SE2d 489) (1982); *Waters v. State*, 248 Ga. 355 (283 SE2d 238) (1981); *Holton v. State*, 243 Ga. 312 (253 SE2d 736) (1979); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Young v. State*, 239 Ga. 53 (236 SE2d 1) (1977); *Coleman v. State*, 237 Ga. 84 (226 SE2d 911) (1976); *Birt v. State*, 236 Ga. 815 (225 SE2d 248) (1976); *Chenault v. State*, 234 Ga. 216 (215 SE2d 223) (1975); *Floyd v. State*, 233 Ga. 280 (210 SE2d 810) (1974); *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974).

DECIDED JUNE 18, 1987 —
RECONSIDERATION DENIED JULY 9, 1987.

*David E. Morgan III, Ronnie A. Wheeler,* for appellant.
*John Pridgen, District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Assistant Attorney General,* for appellee.