## S92P1127. BRANTLEY v. THE STATE.
### (427 SE2d 758)

CLARKE, Chief Justice.

This is a case in which a death sentence has been imposed. Jeffrey David Brantley was convicted by a jury in Burke County on two counts of murder and on one count each of aggravated assault, burglary and a firearms possession charge. He was sentenced to death on one of the two murder counts. He appeals. For reasons which follow, we affirm the convictions, but reverse the death sentence.[1]

1. Brantley and his wife were married in 1981 and divorced in 1986, in part due to an affair she apparently carried on with a man named Bill while Brantley was stationed in Germany with the Air Force. Brantley's wife was given custody of their two children.

On the afternoon of February 2, 1987, Brantley went to his former mother-in-law's residence to pick up his two children. When he left, he took his wife's pocketbook with him. In the pocketbook, he found a recent letter to his former wife from "Bill" in which Bill stated he missed her, thought of her every day, and would always think about the time they "had together." But, Bill wrote, although he would never "lose" his "love" for her, he was involved with someone else and "for now" they would have to just be "good friend[s]." He enclosed his telephone number.

Upon reading this letter, Brantley dropped his children off at a friend's house, and, telling his friend he was "going to kick some ass," he returned to the mother-in-law's house. Brantley burst through the door and began firing a nine millimeter pistol he had purchased earlier that day. He killed his former wife and her sister and critically

---

[1] The crimes occurred the evening of February 2, 1987. The defendant was arrested that evening. The case was tried February 6 through 17, 1989. A motion for new trial was timely filed and denied, after hearing, and after an appeal to this court concerning the record, on June 3, 1992. The case was docketed in this court on June 15, 1992 and was argued orally on September 21, 1992.

injured his mother-in-law, shooting each of them several times.[2]

Brantley then left to look for his former father-in-law, telling the friend with whom he had left his children that "people are going to learn not to [mess] with me" and that everything would be "all right" as soon as he found his father-in-law. After checking with the father-in-law's workplace to see if he had returned from his truck route, Brantley was stopped by the police. A shootout ensued in which Brantley was injured before he finally surrendered.

The evidence supports the conviction on all counts. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his first three enumerations of error, Brantley complains about some of the trial court's jury qualification rulings:

(a) Brantley contends prospective juror Allen should have been excused because he, in Brantley's words, "knew too much about the case" and "required evidence to be presented to overcome his belief" that Brantley was guilty.

Allen had talked to some of the witnesses in the case. Asked by the defendant if he had any "pre-conceived notions" about the guilt or innocence of the defendant, Allen answered: "I wouldn't be able to say if he is guilty or not." Then, as requested, Allen described what he had heard, qualifying his testimony by saying things like, "Now that's what I heard," and "I don't know how true that is."

He did say, when pressed by the defendant, that if he "had to go on" what he had heard, "without hearing anything else," he would have to say Brantley was guilty. But, he testified, as a juror, he would "have to hear all of the facts to make up my mind."

Allen testified that he had no opinion about what penalty should be imposed if Brantley were found guilty. Asked if he thought a death sentence should be automatic if the defendant were found guilty of murder, Allen answered, no, because he had on occasion been "upset enough" with "people" that he "could just about do that myself."

Allen testified that he would not tend to believe a law enforcement officer over a lay witness, that he believed someone could be "so mad that they just ain't in their right mind," and that he would take mental illness or insanity into account when making his determination of guilt or innocence.

Finally, he testified his mind was not made up, that he would follow the evidence presented at trial, and that he would give Brantley the presumption of innocence to which he was entitled.

Allen never said, as Brantley contends, that he would require the

---

[2] His wife was shot in the head and in the buttocks. The sister-in-law was shot in the hand, the right arm and in the back of the left shoulder. The mother-in-law was shot in the abdomen, the buttocks and the left elbow. Three inches of her lower intestine had to be surgically removed, and the lower portion of her right kidney was destroyed.

defense to present evidence to overcome an opinion that Brantley was guilty.

Considering all the circumstances, including the juror's own opinion of his impartiality, the trial court did not err by denying Brantley's challenge for cause. See *Walker v. State*, 262 Ga. 694 (2) (424 SE2d 782) (1993).

(b) Brantley's only objection to prospective juror Crumbley was that she was incapable "of understanding common English," and would not comprehend complex testimony that might be presented. The trial court did not err by denying this challenge.

(c) Brantley did not challenge for cause prospective jurors Black or Banks. The trial court did not err by failing to excuse these jurors sua sponte. *Childs v. State*, 257 Ga. 243 (7) (357 SE2d 48) (1987).

(d) The only objection to prospective juror Jenkins was that her husband's sister was the wife of a state's witness. Defense counsel stated, "I just feel like it falls within the relationship by consanguinity." The juror testified that theirs was not a close family, and she rarely saw the state's witness. There is absolutely nothing else in her testimony that would provide any basis for a challenge for cause. Relationship to a witness is not per se a ground for excusing a prospective juror. *Spence v. State*, 238 Ga. 399 (233 SE2d 363) (1977); *McKee v. State*, 168 Ga. App. 214 (308 SE2d 574) (1983).

(e) A sheriff's wife is not disqualified, per se from serving on a criminal trial jury. Although the sheriff assisted the prosecution with the jury selection, he was not a witness in the case. His wife had not discussed the case with him, and nothing else in her testimony supports a challenge for cause. The court did not err by overruling Brantley's challenge for cause. Ibid.

(f) Jurors Sapp and Johnson were properly excused for their opposition to imposing a death sentence. *Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985). We do not agree with Brantley that the voir dire examination of these prospective jurors was inadequate or that the examination established no more than that the jurors had "qualms" about imposing a death sentence. See *Jarrell v. State*, 261 Ga. 880 (413 SE2d 710) (1992).

(g) The court did not err by denying Brantley's challenges to three prospective jurors on "reverse-Witherspoon" grounds. See, e.g., *Pope v. State*, 256 Ga. 195 (7) (e) (345 SE2d 831) (1986). Although somewhat inconsistent at times, their testimony, in toto, supports the trial court's determination that they realistically could consider imposing a life sentence in a murder case. See *Spivey v. State*, 253 Ga. 187, 197, fn. 3 (319 SE2d 420) (1984).

3. There was no improper limitation of the defense voir dire examination. *Curry v. State*, 255 Ga. 215, 218 (2 b) (336 SE2d 762) (1985).

4. No issue of racial discrimination in the exercise of peremptory challenges was raised at trial. See *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). The issue may not be raised for the first time after trial. *Childs v. State*, 257 Ga. 243 (21) (357 SE2d 48) (1987). Merely because *Powers v. Ohio*, 499 U. S. ____ (111 SC 1364, 113 LE2d 411) (1991), had not been decided at the time Brantley's case was tried does not excuse the procedural default. That a white defendant has standing to raise a *Batson* issue concerning the exclusion of black jurors was not a novel issue in 1989. The holding in *Powers v. Ohio*, supra, was clearly presaged in *Holland v. Illinois*, 493 U. S. 474 (110 SC 803, 107 LE2d 905) (1990), see *Congdon v. State*, 260 Ga. 173, 176-177 (391 SE2d 402) (1990) (Benham, J., dissenting), and was raised in numerous cases throughout the country — with some success — in the years preceding the Court's *Powers* decision.

5. In his sixth enumeration of error, Brantley complains of "improper and inaccurate hearsay" and "irrelevant emotionalism" on the part of the district attorney, claiming the prosecution sought to "stir up the jury with the continuous admission of inadmissible, highly prejudicial evidence," in the form of hearsay testimony by "angry relatives" of the victims.

(a) As we have held, previous difficulties between the accused and the deceased are admissible in a murder case to prove the defendant's bent of mind toward the victim. *Tharpe v. State*, 262 Ga. 110, 112 (7) (416 SE2d 78) (1992).[3] Brantley himself admitted that he struck his wife several times after he caught her kissing "Bill." This testimony was not hearsay. His mother-in-law testified that when her daughter returned from Germany, her face "was all bruised on one side" and "she was trying to cover it up with makeup." Brantley's father-in-law and surviving sister-in-law also testified that Brantley's wife's face was bruised when she returned from Germany. This testimony was not hearsay.

The mother-in-law testified that when Brantley returned to the States, he and his wife fought:

Well, they fought. He would go to work and come home and get mad. And he would throw stuff; break stuff. He kept the kids hysterical. Every afternoon they would come to my house, both her and the kids, crying, and he would be just throwing dishes, throwing anything, breaking it. And it just wasn't a happy home at all.

---

[3] Any issue of non-compliance with the notice requirements of Superior Court Rule 31.3 has not been preserved for review. We note that evidence of prior difficulties between Brantley and his wife was part of his case as well as part of the state's case (even though he puts a different gloss on it).

[They lived together] off and on for about a year. Because he would get — he was just so bad; he kept her and those kids upset so much they ran off from home. He would come home in the afternoon breaking up stuff. One afternoon he came home, got a gun, and went ahead and stood in front of the trailer looking up at her. She would get the kids and they would all three come to my house screaming and hollering about things he had done to them, and the way he was acting.

Brantley did not object to this testimony at trial, but now contends it was all inadmissible hearsay. We disagree. At least some of it clearly was based on the personal observation of the testifying witness. To the extent it was based on what the victim told her at the time, most, if not all, of the testimony would have been admissible under the "excited utterance" exception to the hearsay rule. See Strong, McCormick on Evidence, 4th ed., Vol. 2, § 272 at 215 et seq.[4]

Without addressing specifically every example of alleged hearsay cited by the defendant, we can say that, having reviewed the entire transcript, we find no merit to Brantley's contention that the improper introduction of "endless hearsay evidence tainted the reliability" of the trial.

(b) Nor do we find that the prosecutor argued "facts" to the jury that were "patently false."

Brantley contends the prosecutor took what was really an emotion-inspired domestic tragedy and tried to turn it into a cold-blooded assassination. In effect, Brantley argues that the prosecutor is guilty of misconduct because he failed to credit Brantley's testimony in full and failed to accept only those inferences from the evidence most favorable to the defendant.

For example, Brantley claims it was mere coincidence that he purchased a nine millimeter pistol the afternoon of the day he shot his wife, his sister-in-law and his mother-in-law, even though he concedes he was unemployed and did not have the money in the bank to cover the check he wrote for the gun. He claims that he had some items advertised for sale that he expected to receive money for, that he was expecting a tax refund, and that he would also begin receiving unemployment checks soon, and that one or more of these future sources of income would have covered the check.

He also contends that he knew nothing about the letter until he

---

[4] Our Code includes a "res gestae" exception to the hearsay rule. OCGA § 24-3-3. *McCormick* describes res gestae to include: (1) statements of present sense impressions; (2) excited utterances; (3) statements of present bodily condition; and (4) statements of present mental states and emotions. Id. at 207.

opened his wife's purse; that when he told a witness he was going back to "kick some ass" he did not plan to kill anyone with his new gun; that when he was looking for his father-in-law afterwards, it was not with the purpose of killing him; and that when he got into a shootout with the police, he was trying to commit suicide, not kill any police officers.

All this is possible, we suppose, but it is more reasonable to infer: (1) that when Brantley bought a gun he did not have enough money to pay for, he acted — if not with the specific intention to use it that afternoon — at least with the idea that he might use it; (2) that when he took his wife's purse with him when he left her house, he at least strongly suspected that he would find evidence to confirm his suspicions about "Bill"; (3) that when he returned to her trailer to "kick some ass," he meant to use his new gun; (4) that he meant to kill everyone in the trailer; (5) that he meant to kill his father-in-law as soon as he found him; (6) and that, at least at the outset, he meant to kill the policemen who stopped him.[5]

We find no merit to Brantley's contention that the "entire prosecution theory" was "baloney."

(c) Aside from one instance in which the defendant's objection to the prosecutor's argument was sustained, his complaints about the state's closing argument have not been preserved for review. Absent timely objection, we find no reversible error. *Todd v. State*, 261 Ga. 766 (2) (a) (410 SE2d 725) (1991). As to the one instance objected to by the defendant, we note he apparently was satisfied with the court's rebuke of the prosecutor, as he did not move for a mistrial. There is nothing to review here either.

6. It was not error to exclude medical records containing "diagnostic opinions, conclusions and other statements of third parties not before the court." *Moody v. State*, 244 Ga. 247 (4) (260 SE2d 11) (1979).

7. In his 8th enumeration of error, Brantley complains about various portions of the guilt-phase charge:

(a) The omission to charge the delusional-compulsion portion of the insanity defense (OCGA § 16-3-3) was not error. Not only was there no evidence to support such a charge, but trial counsel conceded that delusional compulsion was not in the case.

(b) We do not agree that the insanity statute is unconstitutionally vague because it is defined in terms of an accused's "mental *capacity* to distinguish between right and wrong at the time of the crime." OCGA § 16-3-2. (Emphasis supplied.)

---

[5] Brantley claims he shot into the air. However, a bullet hole in the side of his pickup truck near where an officer had been standing tends to contradict this claim.

(c) We do not agree that the trial court's instructions on the guilty-but-mentally-ill verdict was unconstitutionally vague or duplicitous. See *Worthy v. State*, 253 Ga. 661 (6) (324 SE2d 431) (1985). The inclusion of extra verbiage concerning mental retardation was not harmful to the defendant.

(d) It is not unconstitutional to place the burden of proving insanity or mental illness on the defendant. *Brown v. State*, 250 Ga. 66 (2) (295 SE2d 727) (1982); *Spivey v. State*, 253 Ga. 187 (2) (319 SE2d 420) (1984). Cf. *Pope v. State*, 256 Ga. 195 (16) (345 SE2d 831) (1986).

(e) The court's instructions on malice, self-defense, voluntary manslaughter, burglary and mutual combat were not erroneous for any reason argued. There was no request for an intoxication charge and therefore no error in the omission to deliver such a charge.

8. In his 9th enumeration of error, Brantley complains of numerous examples of allegedly improper cross-examination of his testimony. Much of this was not objected to. Moreover, the prosecutor is entitled to a thorough and sifting cross-examination of a defendant who elects to testify, even if it is detrimental to the defendant's case. OCGA § 24-9-64.

9. The record does not support Brantley's claim that his blood sample was destroyed, intentionally or unintentionally.

10. Pretermitting whether our ruling in *Brooks v. State*, 259 Ga. 562 (2) (385 SE2d 81) (1989), concerning requests for funds, should retroactively apply to hearings in this case conducted before *Brooks* was decided, we find no reversible error in this case because the record does not show that Brantley objected to the state's presence at the pre-trial hearings on his motions for funds. Compare *Zant v. Brantley*, 261 Ga. 817 (411 SE2d 869) (1992) (trial court granted Brantley's motion to exclude the prosecutor from hearings on Brantley's post-trial motions for funds).

The record does not support Brantley's claim that the funds awarded to him were inadequate.

11. Brantley's constitutional objections to OCGA § 17-8-71 (concerning the order of closing arguments) were not timely raised at trial, and will not be considered here.

12. There was no error in the admission of allegedly gruesome photographs. *Bennett v. State*, 262 Ga. 149, 151 (4) (414 SE2d 218) (1992).

13. In his 14th enumeration of error, Brantley urges us to review additional guilt-phase alleged errors under the Unified Appeal Procedure. See UAP § (IV) (B) (2). These alleged errors include excepting the sheriff from the rule of sequestration, pre-trial excusal of persons summoned for jury duty, denial of additional defense jury challenges, chain of custody and opinion testimony. We have reviewed these mat-

ters and find no reversible error.

14. There is no merit to Brantley's claim that the charges of burglary and commission of a felony with a firearm were sought vindictively.

15. For the murder of his former sister-in-law, the jury imposed a death sentence, finding as statutory aggravating circumstances:

> 1. That the murder of Ruby Ann James was committed while the offender was engaged in the commission of another capital felony, to wit: The murder of Wanda Gail Brantley.

> 2. That the murder of Ruby Ann James was committed while the offender was engaged in the commission of a burglary of the dwelling of Rachel J. Youngblood.

See OCGA § 17-10-30 (b) (2). The evidence supports the jury's findings. Although Brantley contended the contrary, the jury was authorized to conclude that Brantley burst through the door of his mother-in-law's home "without authority" and with the intent to commit the felony of murder, and, thus, that he committed the offense of burglary. That he committed a double murder is clearly supported by the evidence.

Simply because the defendant entered the trailer with the intent to commit murder does not mean that burglary is a lesser included offense of either of the murders that actually occurred, see *Potts v. State*, 261 Ga. 716 (1) (410 SE2d 89) (1991), or that the commission of burglary and the commission of the second murder may not both "count" in aggravation. Cf. *Stripling v. State*, 261 Ga. 1 (12) (401 SE2d 500) (1991).

16. Although nothing in our statutory or case law requires a jury in a death-penalty case to list in writing its findings of mitigating circumstances or to agree unanimously on any particular mitigating circumstance, the trial court in this case instructed the jury:

> I further instruct you that you are to consider any mitigating circumstances that may be involved in this case even as you determine whether any or all of the aggravating circumstances exist as they have been previously set forth for your consideration. . . .

> Should you find any mitigating circumstance o[r] circumstances to be present, you must set them forth in writing and have a list of such circumstances signed by your foreperson. If you find no such mitigating circumstances to be present, you will indicate that fact by writing: "None." A finding of no mitigating circumstances, should such a finding be made,

should likewise be signed by the foreperson of the jury.

Brantley contends such instructions are prohibited by the U. S. Supreme Court cases of *Mills v. Maryland*, 486 U. S. 367 (108 SC 1860, 100 LE2d 384) (1988), and *McKoy v. North Carolina*, 494 U. S. 433 (110 SC 1227, 108 LE2d 369) (1990). We agree.

Although the trial court did not explicitly impose a unanimity requirement on the jury's mitigation findings, the court's instructions contain numerous reminders to the jury that its findings should be unanimous. Requiring a written finding on mitigating circumstances, signed by the foreperson, implicitly imposed a unanimity requirement on mitigating circumstances. The likelihood that reasonable jurors could have so understood these instructions is sufficient to bring this case within the ambit of *Mills v. Maryland* and *McKoy v. North Carolina*, supra.

The state does not even argue that this case is distinguishable from *Mills* if the court's instructions are construed as requiring unanimity on mitigating circumstances. In *McKoy*, the U. S. Supreme Court held that a unanimity requirement on mitigating circumstances is unconstitutional even where the jury is not instructed explicitly to weigh mitigating circumstances against aggravating circumstances, and even where the jury is instructed that it need not impose a death sentence despite finding statutory aggravating factors to exist and finding no mitigating factors to exist. *McKoy v. North Carolina*, 110 SC, supra at 1231.

We are bound by the U. S. Supreme Court's interpretation of the Eighth Amendment. Instructions similar to those given here have been construed to restrict the jury's consideration of mitigating circumstances, and it does not matter whether the barrier to full consideration of mitigating circumstances comes from state statute or from the sentencing court's jury instructions. *Mills v. Maryland*, supra, 108 SC at 1865-1866. Therefore we must reverse.

17. The remaining enumerations of error need not be addressed. The judgment of conviction is affirmed on all counts. The death sentence imposed for the murder of Brantley's sister-in-law is reversed and the case is remanded for resentencing.

*Judgment affirmed in part, reversed in part. Hunt, P. J., Benham, Fletcher, Sears-Collins, Hunstein, JJ., and Judge Frank C. Mills III concur.*

DECIDED FEBRUARY 25, 1993.

*Richard E. Allen, Clive A. Stafford-Smith*, for appellant.
*Michael C. Eubanks, District Attorney, Richard E. Thomas, Assistant District Attorney, Michael J. Bowers, Attorney General,*

*Mary H. Hines, Assistant Attorney General,* for appellee.