## S99P1518. NANCE v. THE STATE.
(526 SE2d 560)

Hunstein, Justice.

A jury convicted Michael Wayne Nance of malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony. The jury recommended a death sentence for the malice murder conviction after finding beyond a reasonable doubt two aggravating circumstances: the offense of murder was committed by someone with a prior record of conviction for a capital felony, OCGA § 17-10-30 (b) (1); and the offense of murder was committed while the defendant was engaged in the commission of an armed robbery. Id. at (b) (2). The trial court sentenced Nance to death and he appeals.[1]

1. The evidence adduced at trial shows that Nance stole a 1980 Oldsmobile Omega and drove to the Tucker Federal Savings & Loan on December 18, 1993. He entered the bank wearing a ski mask and gloves and carrying a .22 caliber revolver. While ordering the tellers to put money into two pillowcases he had brought with him, he said "no dye money or I'll kill you" and "I'm going to come back and kill you all if the dye thing goes off." Despite Nance's threats, the tellers managed to slip two dye packets in with the money. Nance exited the bank and got into the Oldsmobile where the dye packets activated, emitting red dye and tear gas. Nance abandoned the Oldsmobile holding the gun in his right hand covered by a plastic trash bag. His ski mask and the dye-stained bags of money were left in the car.

Nance ran to a liquor store parking lot. Dan McNeal had just made a purchase at the liquor store and was standing in the parking lot. Gabor Balogh had just left the liquor store and was backing his car out of a parking space. Balogh was only halfway out of the parking space when Nance ran around the front of Balogh's car, yanked open the front driver's-side door, and thrust his right arm into the

---

[1] The crimes were committed on December 18, 1993. On April 5, 1994, Nance was indicted for malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony. The State filed a notice of intent to seek the death penalty on April 13, 1994. The trial took place from September 8-26, 1997. The jury convicted Nance of all counts on September 25, 1997, and the jury recommended a death sentence for malice murder the following day. In addition to the death sentence, the trial court sentenced Nance to a 20-year sentence for aggravated assault with concurrent sentences of 20 years for theft by taking and 10 years for criminal attempt to commit armed robbery. The trial court also sentenced Nance to a consecutive five-year sentence for possession of a firearm during the commission of a felony. The felony murder conviction was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Nance filed a motion for new trial on October 24, 1997, which was amended on March 18, 1999, and denied by the trial court on March 19, 1999. The case was docketed in this Court on July 14, 1999, and orally argued on October 12, 1999.

car. McNeal saw Balogh leaning away from Nance with his hands on the steering wheel. He heard Balogh screaming and saying "No, no." Nance shot Balogh in the left elbow and the bullet entered his chest. The medical examiner testified that the bullet moved downward through Balogh's body, passing between the upper and lower lobes of his left lung and lacerating his heart before stopping in his liver.

Nance then pointed the gun at McNeal and said, "Give me your keys." McNeal ran around the side of the liquor store and Nance fired another shot. McNeal was not hit. Nance apparently ran around the other side of the store because the two men encountered each other behind the store. McNeal turned and ran back around the store to the parking lot. He went to Balogh's car and saw Balogh slumped over and gasping for breath. Balogh died before the ambulance arrived.

Nance ran to a nearby gas station where he held the gun to his head during a one-hour standoff with police. He told the police, "If anyone rushes me, there's going to be war." The police convinced him to surrender. Nance's gloves and shirt were stained with the same red dye used in the dye packets. A firearms expert testified that Nance's gun, which contained two spent shells, was probably the same gun used to kill Balogh. Nance confessed to the bank robbery, but said that he had only fired once up in the air to scare Balogh because Balogh was trying to run him over with his car. To show Nance's intent and bent of mind, the State presented evidence that Nance robbed another bank in the same county in September 1993 and issued a similar threat to the teller. In the penalty phase, the State presented evidence that Nance committed an armed robbery in Kansas in 1984.

The evidence was sufficient to enable a rational trier of fact to find beyond a reasonable doubt proof of Nance's guilt of malice murder, felony murder, aggravated assault, theft by taking, criminal attempt to commit armed robbery, and possession of a firearm during the commission of a felony. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the two statutory aggravating circumstances which support his death sentence for the murder. Id.; OCGA § 17-10-35 (c) (2).

2. Before trial, Nance announced his intention to present expert mental health testimony in the sentencing phase. In accordance with law, the trial court required Nance to submit to a mental health examination by a State psychologist. See *Abernathy v. State*, 265 Ga. 754 (1) (462 SE2d 615) (1995) (if defendant intends to present expert mental health testimony as mitigating evidence, he must submit to a mental health examination by a State expert); *Jenkins v. State*, 265 Ga. 539 (3) (458 SE2d 477) (1995). Dr. Theresa Sapp conducted the

State's mental health examination of Nance. She read Nance his constitutional rights and he signed a rights waiver form. Nance's attorneys were also present throughout the examination. During the examination, Nance told Dr. Sapp that he had ingested cocaine, Dom Perignon, and marijuana before he left his house to rob the bank on December 18, 1993. While the State was presenting its case-in-chief in the guilt-innocence phase, it called Dr. Sapp as a witness. Over Nance's objection, she testified that Nance told her he had ingested cocaine, Dom Perignon, and marijuana on the morning of the murder. Dr. Sapp was not qualified as an expert at that time, was not referred to as a doctor, and she presented no mental health testimony. Nance argues that Dr. Sapp's testimony could only have been presented in rebuttal to the testimony of Nance's mental health expert in the sentencing phase. The State argues that Dr. Sapp did not testify as a mental health expert in the guilt-innocence phase and that Nance's statement to her was admissible because it was voluntary and preceded by *Miranda* warnings.

The rule requiring a defendant who elects to present the testimony of a mental health expert to submit to examination by a State expert arises from "'the State's overwhelming difficulty in responding to the defense psychiatric testimony without its own psychiatric examination of the accused and by the need to prevent fraudulent mental defenses.'" *Lynd v. State*, 262 Ga. 58 (11) (414 SE2d 5) (1992), quoting *Battie v. Estelle*, 655 F2d 692, 702 (5th Cir. 1981). See also *Buchanan v. Kentucky*, 483 U. S. 402, 422 (107 SC 2906, 97 LE2d 336) (1987); *Estelle v. Smith*, 451 U. S. 454, 465 (101 SC 1866, 68 LE2d 359) (1981); *Abernathy*, supra, 265 Ga. at 754-755 (2); *Jenkins*, supra, 265 Ga. at 540-541 (3). The rule seeks a fair balance between the interests of the State, the regard for the function of the courts to ascertain the truth, and the scope of a defendant's privilege against self-incrimination. See *Battie*, supra, 655 F2d at 702, n. 22. It has been likened to the defendant's waiver of his privilege against self-incrimination should he choose to testify on his behalf; if he takes the stand, the State may cross-examine him. See *Battie*, supra; *Lynd*, supra. If a defendant who wishes to present the testimony of a mental health expert at his trial refuses to submit to an examination by a State mental health expert, the trial court may prevent the defendant's expert from testifying. See *Abernathy*, supra at 754 (1); *Lynd*, supra. If a defendant chooses to present mental health evidence through lay witnesses only, the State may not rebut the mental health evidence with the testimony of its mental health expert. *Abernathy*, supra at 755 (2).

Therefore, the purpose of the rule requiring the defendant to submit to a State mental health examination under these circumstances is to permit the State to formulate a response or a rebuttal to

the testimony of the defendant's mental health expert. See *Estelle*, supra, 451 U. S. at 465; *Lynd*, supra; *Motes v. State*, 256 Ga. 831 (2) (353 SE2d 348) (1987). This purpose was subverted in Nance's case when, during the State's case-in-chief in the guilt-innocence phase, the State's expert stripped off her medical title and testified as a lay witness about what the defendant told her during the examination. Access to the defendant's psyche was permitted so the State could respond to the defendant's mental health expert, not to gather incriminating statements that bolster the State's case. A defense lawyer in a capital case, who must prepare for the sentencing phase should his client be convicted, should not be forced to choose between presenting mental health mitigation evidence through an expert and providing the State with evidence with which to convict his client. Indeed, many jurisdictions expressly prohibit the introduction of statements obtained during a court-ordered mental health examination to prove the defendant's guilt. See, e.g., *United States v. Byers*, 740 F2d 1104, 1111, n. 8 (D.C. Cir. 1984); *Gibson v. Zahradnick*, 581 F2d 75, 78 (4th Cir. 1978) (use of incriminating statement obtained during court-ordered mental health examination to prove defendant's guilt is unconstitutional); *United States v. Williams*, 456 F2d 217, 218 (5th Cir. 1972); Fed. R. Crim. P. 12.2 (c) ("No statement made by the defendant in the course of any [court-ordered psychiatric] examination . . . shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony."); Mo. Ann. Stat. § 552.030 (5) (West Supp. 1999); Ohio Rev. Code Ann. § 2945.371 (J) (Anderson 1999); Va. Code Ann. §§ 19.2-169.7, 264.3:1 (G) (Michie 1995). We therefore restate our holding in *Abernathy* that when a defendant must submit to a court-ordered mental health examination because he wishes to present expert mental health testimony at his trial, the State expert may only testify in rebuttal to the testimony of the defense expert or to rebut the testimony of the defendant himself.[2] *Harris v. New York*, 401 U. S. 222, 225-226 (91 SC 643, 28 LE2d 1) (1971); *Booker v. Wainwright*, 703 F2d 1251, 1257-1258 (11th Cir. 1983); *Abernathy*, supra, 265 Ga. at 756. The trial court erred by allowing the State to introduce this evidence other than in rebuttal; however, we conclude that the evidence that Nance ingested alcohol and illegal drugs on the morning of the murder was

---

[2] This rule applies whether the defendant wishes to present expert mental health testimony in the guilt-innocence phase to support an insanity defense, see *Motes*, supra, 256 Ga. at 832 (2), or as mitigation evidence in the sentencing phase. See *Abernathy*, supra, 265 Ga. at 754-755. To the extent *Hittson v. State*, 264 Ga. 682 (2) (449 SE2d 586) (1994) authorized a State expert to testify in response to lay witness testimony that the defendant was remorseful, it is overruled.

harmless due to the overwhelming evidence of his guilt outlined in the first division.

3. Nance claims that the trial court erred by refusing to charge the jury on voluntary manslaughter because he told the police he fired his gun in response to the victim trying to run him over with his car. However, Nance also stated that he shot into the air to scare the victim and that he did not want to hit anyone. " 'Intent to kill is an essential element of both murder and voluntary manslaughter,' " *Walker v. State*, 258 Ga. 443 (5) (370 SE2d 149) (1988), quoting *Parks v. State*, 254 Ga. 403 (12) (330 SE2d 686) (1985); OCGA §§ 16-5-1, 16-5-2, and Nance's statement established otherwise. In addition, a voluntary manslaughter charge is not warranted when the only alleged evidence of provocation is the victim resisting an armed robbery. See *Turpin v. Christenson*, 269 Ga. 226, 234 n. 6 (497 SE2d 216) (1998). The trial court did not err by refusing to give a charge on voluntary manslaughter.

4. Evidence of the December 1993 bank robbery was admissible in the guilt-innocence phase as part of the criminal transaction which led to the murder. See *Satterfield v. State*, 256 Ga. 593 (6) (351 SE2d 625) (1987) (State is entitled to present evidence of the entire res gestae of the crime). The trial court also permitted the State to introduce evidence of Nance's September 1993 bank robbery to show his intent and bent of mind during the December 1993 crimes. See *Belton v. State*, 270 Ga. 671 (5) (512 SE2d 614) (1999); *Raulerson v. State*, 268 Ga. 623 (8) (491 SE2d 791) (1997); *Williams v. State*, 261 Ga. 640 (2) (409 SE2d 649) (1991). The record supports the trial court's finding that this evidence was offered for the proper purpose of showing Nance's intent and bent of mind (the similar threats to the tellers in each robbery showed Nance's willingness to kill people who interfered with his plans); that Nance was the perpetrator of the September 1993 bank robbery (Nance pled guilty in federal court); and that the September 1993 bank robbery was sufficiently similar to the December 1993 crimes that proof of the former tended to prove the latter. See id. The trial court did not err by admitting this evidence.

5. During direct examination by the State, Dan McNeal testified that he was currently living at Victory Home, a Christian treatment center for people suffering from problems with alcohol, drugs, and depression. On cross-examination, Nance asked McNeal how his recovery was going and whether he was a regular customer at the liquor store. The State on redirect examination asked McNeal if his current stay at Victory Home had anything to do with the murder of Balogh. The trial court overruled Nance's objection, and McNeal replied that witnessing the murder and being shot at had directly led to "how I've lived the past almost four years." Nance claims on appeal

that this testimony was victim-impact evidence that is improper in the guilt-innocence phase. However, Nance's cross-examination questions implied that alcohol may have affected McNeal's perception of the events he witnessed in 1993 and the State is permitted to rehabilitate a witness whose credibility had been attacked. See *Blige v. State*, 264 Ga. 166 (2) (441 SE2d 752) (1994). We find no error.

6. Nance complains that six prospective jurors were biased in favor of the death penalty and the trial court erred by refusing to excuse them for cause.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

*Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). On appeal, the relevant inquiry is whether the trial court's qualification of the prospective juror is supported by the record as a whole. *Greene*, supra, 268 Ga. at 49. An appellate court must pay deference to the finding of the trial court; this deference includes the trial court's resolution of any equivocations or conflicts in the prospective juror's responses on voir dire. Id. "Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of discretion." Id. at 50. After review of the record, we conclude that the trial court did not abuse its discretion with regard to the qualification of five of these prospective jurors.

However, the trial court erred by failing to excuse prospective juror Johnson for cause because her views in favor of capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. See *Wainwright*, supra, 469 U. S. at 424 (II); *Greene*, supra, 268 Ga. at 48; *Childs v. State*, 257 Ga. 243 (7) (357 SE2d 48) (1987) (a potential juror is disqualified if unable to fairly consider a life sentence). Her answers to voir dire questions about the death penalty clearly show that she would always vote to impose a death sentence if Nance was convicted of murder and the jury found a statutory aggravating circumstance, regardless of the evidence and the trial court's instructions.[3] Briefly summarized, when asked by Nance's counsel whether, if Nance was convicted, she would always choose death or whether

---

[3] The portions of prospective juror Johnson's voir dire which address the death penalty are attached as an appendix to this opinion.

she could consider alternative punishments, she replied, "It would always be death." Later, in response to questioning by the district attorney, she said she did not know that all murderers are not eligible for the death penalty and that the State had to prove a statutory aggravating circumstance. She said that she could follow the law and added, "And if you prove to me that he did do it, then at that time —." The district attorney replied that was not the standard, and again told her the State would have to prove a statutory aggravating circumstance. Ms. Johnson said she understood. Nance's counsel then asked her if Nance was guilty and the State proved a statutory aggravating circumstance, "would you then always give the death penalty?" Ms. Johnson replied, "Yes, sir." The trial court outlined the three sentencing options and asked Ms. Johnson if she could apply the law and the facts of the case and choose the appropriate sentence. She said she could. Nance's counsel then asked her if given all three sentencing options and Nance was guilty and the jury found aggravating circumstances, "would you always choose death?" She replied, "Yes, sir." The trial court qualified her to serve on the jury over Nance's objection.

It is common for a prospective juror to initially state that he would always choose death for a convicted murderer when the prospective juror is ignorant of the bifurcated nature of a capital trial and is unaware that all murders do not warrant a death sentence under Georgia law. See, e.g., *Bishop v. State*, 268 Ga. 286 (6) (486 SE2d 887) (1997); *Finney v. State*, 253 Ga. 346 (3) (320 SE2d 147) (1984). Often, after the prospective juror is apprised of the procedure involved in a capital trial and that not all murderers receive the death penalty, the prospective juror alters his initial position and may become qualified to serve. See id. In this case, however, Ms. Johnson three times firmly and unequivocally stated that she would always vote to impose a death sentence if Nance was convicted and the jury found a statutory aggravating circumstance. Two of these statements came after Ms. Johnson was informed of the procedure in a capital trial and that not all murderers receive the death penalty under Georgia law. At no time during voir dire did Ms. Johnson say she could vote to impose a life sentence. The trial court told her the sentencing options and asked her if she could listen to the law and the facts and choose the appropriate sentence, to which she replied affirmatively, but it is clear from her other responses that Ms. Johnson believed the appropriate sentence would always be a death sentence. See *Alderman v. State*, 254 Ga. 206 (4), n. 2 (327 SE2d 168) (1985) (prospective juror properly disqualified under *Wainwright* when he stated that he could listen to the evidence and arrive at a "fair sentence," but other responses showed that he did not consider the death penalty to be a "fair sentence"). Therefore, the trial court

abused its discretion by qualifying Ms. Johnson to serve on the jury. See *Greene*, supra, 268 Ga. at 48-50; *Pope v. State*, 256 Ga. 195 (7) (e) (345 SE2d 831) (1986) (reversible error when prospective juror who would automatically vote for a death sentence for a convicted murderer and would not consider mitigating evidence was qualified to serve), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999). The error regarding prospective juror Johnson does not affect the convictions because she was not disqualified on the question of guilt or innocence. *Pope*, supra. Accordingly, Nance's sentence of death is reversed. Id.

7. Because the evidence supports the jury's finding of the statutory aggravating circumstances, on retrial of the penalty phase, the State may again seek the death penalty. *Childress v. State*, 266 Ga. 425 (6) (467 SE2d 865) (1996).

*Judgment affirmed in part and reversed in part. All the Justices concur, except Carley and Hines, JJ., who concur specially.*

APPENDIX.

. . .

NANCE'S COUNSEL: Now, you understand that the law never requires the death penalty to be imposed in any case, but it may be considered in murder cases by the jurors. In deciding whether the death penalty's appropriate, could you follow the judge's instructions and could you consider all the alternatives, and the alternatives being life in prison, life in prison without the possibility of parole, and the death sentence? Could you consider all three and decide what was appropriate in a particular case?

MS. JOHNSON: Yes, sir.

NANCE'S COUNSEL: And assuming that you sat on the jury and you and the other 11 jurors found Michael guilty beyond a reasonable doubt, would you still be able to consider alternative punishments, or would your sentence always be death if you found him guilty?

MS. JOHNSON: It would always be death.

NANCE'S COUNSEL: It would always be death? You believe then, in the eye for an eye, if a person kills somebody, they should die?

MS. JOHNSON: Yes.

NANCE'S COUNSEL: And so what I'm asking, you wouldn't be able to consider the life in prison or life in prison without parole if you found him guilty; is that correct?

MS. JOHNSON: That's correct.

. . .

PROSECUTOR: Ms. Johnson, in response to some questions that

[Nance's counsel] had asked you about the death penalty, I want to go back and talk about that a little more. First of all, do you understand that not every murder under our law is even eligible for a jury to decide whether or not that person gets the death penalty?

MS. JOHNSON: I did not know that.

PROSECUTOR: And do you understand that, so not all murders are even entitled to consideration for the death penalty. Did you know that?

MS. JOHNSON: No.

PROSECUTOR: And there is only a certain class or a certain type of murder where the State has a certain burden where you would even be asked to consider that?

MS. JOHNSON: I didn't know that.

PROSECUTOR: Now, this case is one of those cases where the State has announced that it's going to seek the death penalty in the case. What that means is we would have to prove to a jury beyond a reasonable doubt that the defendant is guilty of the crime, first of all. That would be the first decision the jury makes. Do you understand that?

MS. JOHNSON: Right.

PROSECUTOR: The second decision is then we would have to prove to you beyond a reasonable doubt that one of what is called an aggravating circumstance exists in order for you to even be allowed to vote for the death penalty. Do you understand that?

MS. JOHNSON: Yes.

PROSECUTOR: In considering this particular case, if you were selected as a juror, could you listen to the instruction of the Court and could you hold the State to the burden of proving the aggravating circumstance beyond a reasonable doubt before you would even consider imposing the death penalty?

MS. JOHNSON: Yes.

PROSECUTOR: And would you follow the law as it is given to you by the Court?

MS. JOHNSON: Yes.

PROSECUTOR: So despite your feeling that the way [Nance's counsel] put it, an eye for an eye, that really isn't your feeling, is it? Your feeling is that you're prepared to follow the law?

MS. JOHNSON: I'm prepared to follow the law. And if you prove to me that he did do it, then at that time —

PROSECUTOR: Now, you understand that's not the standard. The standard is we have to prove to you that he did it.

MS. JOHNSON: Right.

PROSECUTOR: And we have to prove to you that this is a case where you can consider the death penalty where there's an aggravating circumstance.

MS. JOHNSON: Yes, sir, I understand that.

PROSECUTOR: Thank you. That's all the questions I have.

TRIAL COURT: [Nance's counsel]?

NANCE'S COUNSEL: Ms. Johnson, I don't want to belabor this. And like I say, we're just trying to find out what your feelings are. There's nothing wrong with whatever your feelings are. If, as [the prosecutor] says, you found Michael guilty beyond a reasonable doubt and you found the aggravating circumstances that the judge told you you had to find and you found that they were there, would you then always give the death penalty?

MS. JOHNSON: Yes, sir.

NANCE'S COUNSEL: That's all I have.

TRIAL COURT: Okay. [Prosecutor], anything further?

PROSECUTOR: No, Your Honor.

TRIAL COURT: All right. Ms. — Counsel, do you mind if I ask her a question? Ms. Johnson, you understand that should the Defendant in this case be found guilty, there are three possible sentences that the jury would have to consider? And one is life in prison, one is life in prison without the possibility of parole, and one is the death penalty. Do you understand that?

MS. JOHNSON: Yes, I do.

TRIAL COURT: Do you think you could apply the law as I were to tell you the law exists in this state to the facts as you hear them in this courtroom and choose the appropriate sentence?

MS. JOHNSON: Yes, sir.

TRIAL COURT: Okay. All right. Any further questions, counsel?

PROSECUTOR: None from the State, Your Honor.

NANCE'S COUNSEL: Ms. Johnson, let me ask you one thing. I don't want to belabor this, but even though you're given all the choices and everything, would your choice, if you were given those choices by the judge and if you found him guilty beyond a reasonable doubt and found aggravating circumstances, would you always choose death?

MS. JOHNSON: Yes, sir.

NANCE'S COUNSEL: That's all I have. Thank you.

TRIAL COURT: Okay. All right. I'm going to have you step outside the door there for a second.

CARLEY, Justice, concurring specially.

In Division 6, the majority concludes that Nance's death sentence must be reversed because the trial court erred in failing to excuse juror Johnson for cause. I am in full agreement with that holding. I also concur in the remainder of the opinion, with the exception of certain portions of Division 2. In that division, the majority correctly finds that it was error, but harmless, for the trial court to

allow the State's expert to testify, during the prosecution's case in chief in the guilt-innocence phase, that Nance made certain statements to her in the course of a mental health examination. I believe, however, that Division 2 errs in its ultimate holding that "the State expert may only testify in rebuttal to the testimony of the defense expert or to rebut the testimony of the defendant himself."

There is no authority for limiting the State's expert to rebuttal of testimony given by either the defendant's expert or the defendant himself. To the contrary, " 'the State has the right to call rebuttal witnesses to refute or explain *any* or *all* of the defendant's evidence. . . . (Cit.)' [Cit.]" (Emphasis supplied.) *Watkins v. State*, 206 Ga. App. 701, 705 (5) (426 SE2d 238) (1992). In particular, the right to rebut a witness' testimony through impeachment "is one of the cornerstones of the adversarial process. Even evidence which violates constitutional standards of due process, such as unlawfully obtained confessions, may be admitted for impeachment purposes. [Cit.]" *Charlton v. State*, 217 Ga. App. 842, 844 (459 SE2d 455) (1995).

The majority relies upon federal cases applying Federal Rule of Criminal Procedure 12.2 (c). However, the federal rule does not prohibit the rebuttal use of a statement which the defendant made to the State's expert and which related to an issue other than mental condition, if the defense has already introduced testimony on that particular issue. *United States v. Kessi*, 868 F.2d 1097, 1108 (V) (9th Cir. 1989); 1A Wright, Federal Practice & Procedure: Criminal 3d § 209, pp. 441-442 (1999).

I also cannot agree with the second footnote, wherein the majority overrules *Hittson v. State*, 264 Ga. 682, 683 (2) (449 SE2d 586) (1994) to the extent that that decision "authorized a State expert to testify in response to lay witness testimony that the defendant was remorseful. . . ." Consideration of the viability of *Hittson* is not even necessary, because the State's expert in this case testified during the State's case in chief and not in rebuttal. Moreover, as previously discussed, I believe that *Hittson* properly holds that statements made to a State expert may be related by that expert in rebuttal of the defendant's evidence, regardless of the source of that evidence. *Hittson* is correct because it involves only testimony introduced by the State during rebuttal of the evidence produced by the defense. It should not be overruled.

I am authorized to state that Justice Hines joins in this special concurrence.

DECIDED FEBRUARY 28, 2000 —
RECONSIDERATION DENIED MARCH 23, 2000.

*Edwin J. Wilson,* for appellant.

*Daniel J. Porter, District Attorney, Phil Wiley, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Goldberg, Assistant Attorney General,* for appellee.