314 Ga. 38
FINAL COPY

S22A0550. MOBLEY v. THE STATE.

ELLINGTON, Justice.

A Walton County jury found Jerome Mobley guilty of breaking into his estranged wife's home, in violation of a condition of pretrial bond, and shooting and killing her in the presence of the couple's children.[1] Mobley contends that a jury instruction on voluntary manslaughter was warranted by at least slight evidence of sudden

---

[1] The shooting death of Katelyn Mobley occurred on April 18, 2018. On June 29, 2018, a Walton County grand jury indicted Jerome Mobley for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault (Count 3), cruelty to children in the first degree (Counts 4 and 5), aggravated stalking (Count 6), burglary in the first degree (Count 7), and possession of a firearm during the commission of a felony (Count 8). At a trial that ended on December 5, 2018, the jury found Mobley guilty on all counts. The trial court sentenced Mobley to serve life in prison without the possibility of parole on Count 1 and to prison terms of 20 years each on Counts 4 and 5, ten years on Count 6, 20 years on Count 7, and five years on Count 8, for an aggregate sentence of life without parole plus 75 years. Count 2 was vacated by operation of law, and Count 3 merged with Count 1 for purposes of sentencing. Mobley filed a timely motion for new trial, which he amended on February 21, 2021. The trial court conducted a hearing on the motion on June 3, 2021. The trial court denied the motion for new trial on December 2, 2021. Mobley filed a timely notice of appeal. The case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

provocation and that the trial court therefore erred in failing to give the instruction he requested. Because a voluntary manslaughter instruction was not warranted by the evidence, as explained below, we affirm.

Pertinent to Mobley's argument on appeal, the evidence presented at trial showed the following. At 12:12 a.m. on January 16, 2018, Katelyn Mobley called 911 and reported that her husband, from whom she was separated, had forced himself into her home and taken their nine-year-old daughter and eight-year-old son outside to his truck. She told the dispatcher that Mobley had been very abusive throughout their marriage, that he had threatened her over the phone before showing up to her house, and that he had told her that he would "haunt [her] the rest of [her] life." While Katelyn was on the phone with the dispatcher, Mobley sent their daughter back into the house to get his pistol that was in Katelyn's possession, and he threatened to knock out the windows if Katelyn did not give him the gun. When sheriff's deputies arrived, Mobley attempted to flee with his son still in his truck, but officers took Mobley into custody.

As a condition of being released on bond in connection with charges based on the January 16 incident, Mobley agreed to have no contact with Katelyn or their children. This no-contact condition included direct and indirect contact via third parties, as well as e-mail, text, phone calls, and other correspondence. Over the next three months, Mobley repeatedly violated this condition with texts, phone calls, and Facebook messages asking to see the children. In her responses, Katelyn often expressed her fear of Mobley and her expectation that he would kill her.[2]

At 6:46 a.m. on April 18, 2018, the Mobleys' daughter called 911 and reported that her father had broken in and shot her mother with "a long gun." Rebecca Barnett, an expert forensic interviewer, interviewed the Mobleys' daughter and son later that morning. The interview recordings were played at trial. The Mobleys' daughter

---

[2] The State introduced a large number of texts and Facebook messages the two exchanged following their separation. In August 2017, after a series of messages in which Katelyn said that she believed Mobley would kill her, she sent one that said, in part, "All you do is pick on people who can't defend themselves. You are a f**king bully. You might kill me, but at least I won't have to live in hell and torture any more. You will kill me, but g**damn it, I will die brave and not cowering in a f**king corner."

told the interviewer that she was in bed that morning when she heard "a window break open, . . . thought it was just something on the TV[,]" and then went back to sleep. She woke up again when she heard a gunshot. She woke up her brother, and the children hid behind the open door to his bedroom. The daughter thought she heard two or three shots fired in the living room, and she later saw two shell cases lying in the living room where she heard the shots being fired. When the shooting stopped, the children went out into the living room, and the daughter saw Mobley run out the side entry door off the dining room. In the living room, the daughter saw her mother, who had been shot, fall to the ground. Katelyn told her daughter to "call 911 right now," and then she stopped breathing. When the daughter looked for Katelyn's purse to get her phone, the daughter saw blood beside Katelyn's bed. The daughter also saw broken glass on the floor near the side entry door, and the glass part of the door was broken.

The Mobleys' son told the interviewer that he woke up that morning, hearing a sound like fireworks or "like a .22 going off" and

4

smelling an odor like fireworks. The son saw Mobley run out of Katelyn's room holding "his old 12-gauge" that Mobley and the son had previously used to go hunting. The son saw Katelyn fall to the floor in the living room. The son told the interviewer that Mobley "wanted revenge and he got it" because Katelyn "made him go to jail."

Investigators found damage to the side entry door. Broken glass was scattered outside the door. They also saw broken glass inside on the dining room floor near a broken plastic window-insert frame. Katelyn lay dead in the living room near the door to the main bedroom. The bedroom doorframe was split above the strike plate, consistent with the door having been kicked or forced open. Investigators found a bullet hole through the bedroom door; a .38-caliber six-shot revolver, containing five spent cartridge cases and one damaged complete cartridge, near the threshold from the living room into the main bedroom; and bullets and bullet fragments, bullet holes, and ricochet marks in several places in the ceiling, walls, floor, and furniture in the living room and main bedroom.

Investigators saw evidence of two shotgun blasts: one hit Katelyn on the side of her arm, and one hit the back wall of the main bedroom. Investigators also found two spent shotgun cartridge cases on the living room floor, and multiple pellets of buckshot in and around Katelyn's bed. A firearms examiner determined that the shotgun cartridge cases found in Katelyn's living room had been fired from the shotgun that was in Mobley's possession when he was arrested two days after the shooting and that the bullets found at the crime scene had been fired from the revolver found near Katelyn's body. Mobley was arrested two days after the shooting; at that time he had a bullet in his leg.

Mobley testified as follows. In July 2017, after ten "volatile" years of marriage in which he and Katelyn "argued a lot," the couple separated. They shared custody of their children informally, without a court order. They communicated by Facebook messaging and by cell phone. For the next few months after the January 2018 incident that led to the no-contact bond conditions, Mobley continued to send Katelyn Facebook messages seeking time with their children. He

conceded that "she was essentially[,] over and over again[,] saying she didn't want anything to do with" him, "but[, because they] had children," and with "nothing in place for any visitation or anything like that," he felt that "[they] had to contact each other." Mobley also conceded that he "might have said" that he would "haunt [Katelyn] the rest of her life."

Mobley testified about the day he shot Katelyn as follows. On the morning of April 18, 2018, Mobley had an appointment with his attorney. Knowing that it would be a violation of the no-contact bond provisions, he first drove to Katelyn's house unannounced to see his children before they left for school. He knocked on the front door, Katelyn answered the door, wrapped in a sheet or towel, and he "stepped foot in the house." They argued; it became more "heated"; Katelyn told Mobley to "get the f**k out of [her] house"; and Mobley insisted, "[N]o, I am not going until I see my kids. . . . I am not leaving. I am not leaving." Katelyn went back into her bedroom and closed the door. Their daughter "peeked her head out" from the children's room, and he said, "[Y]'all get back in the room." And

"after that is when [Mobley] got shot in the upper right thigh," through the closed bedroom door, with a handgun that he had given Katelyn for protection. Mobley did not "remember [anything] after getting shot" and could not "really tell . . . what happened after that." Asked how he felt when he got shot, Mobley testified, "I won't [ever] forget the smell of the gun smoke and blood." He repeatedly denied ever going into Katelyn's bedroom. He remembered "going toward the [dining room to the side entry] door" after being shot, trying to get away from the house, "stumbling," and falling. Mobley went to his truck, "reached behind the seat," where he kept his shotgun, and did not "remember much after that." He testified, "A lot of it is foggy. I cannot remember great details. I can remember bits and pieces of stuff." Specifically, he did not remember shooting Katelyn. Mobley testified that he did not intend to shoot Katelyn when he went to her house, but he "guess[ed]" that he developed the intent to shoot her "after [he] got shot" by her.

Mobley contends that the trial court erred by refusing his request for a jury instruction on voluntary manslaughter as a lesser

offense of murder.[3] Mobley points to the physical evidence showing that Katelyn shot at him six times, "and one of [the shots] hit [him] in the thigh — a very sensitive area of the body," and to evidence that this "volley of fire" was "preceded by arguments and [Katelyn's] refusal to let him in the home." Mobley argues that "[b]eing shot under these circumstances is sufficient provocation for a reasonable person to react with a sudden, violent, and irresistible passion."

Voluntary manslaughter is the killing of another person under circumstances that would otherwise be murder when the killer

> acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

OCGA § 16-5-2 (a). "A trial court is required to give a requested charge on voluntary manslaughter if there is slight evidence of the elements of OCGA § 16-5-2 (a)." *Hatney v. State*, 308 Ga. 438, 441

---

[3] Mobley also requested a jury instruction on justification, which the trial court refused to give. Mobley does not challenge that ruling on appeal.

(2) (841 SE2d 702) (2020). Furthermore, this Code section, in using a "reasonable person" standard, "prescribe[s] an objective standard for determining when a defendant is entitled to a charge on voluntary manslaughter[.]" *Partridge v. State*, 256 Ga. 602, 603 (4) (351 SE2d 635) (1987). "Whether the defendant presented any evidence of provocation sufficient to excite the passions of a reasonable person is a question of law." *Davenport v. State*, 311 Ga. 667, 672 (3) (859 SE2d 52) (2021).

Here, the evidence did not support a jury instruction on voluntary manslaughter as a lesser offense of murder for two reasons. First, Mobley did not identify any evidence supporting an inference that Katelyn's allegedly provocative conduct, shooting him through the bedroom door, actually engendered in him a sudden, violent, and irresistible passion. Although there is evidence, including Mobley's testimony and some of the physical evidence, that supports an inference that Katelyn shot him through the bedroom door, that evidence, without more, does not support any particular inference about Mobley's state of mind after being shot.

Neither of the Mobleys' children stated during their forensic interviews that they observed Mobley's reaction to being shot. And Mobley did not testify that he was provoked, angry, or inflamed by being shot by Katelyn — only that he could not remember what happened after she shot him. Cf. *Scott v. State*, 291 Ga. 156, 157-158 (2) (728 SE2d 238) (2012) (Where the defendant testified that he "lost it" and started shooting when, during a confrontation about the victim's molestation of the defendant's niece, the victim taunted the defendant, "the slight evidence necessary to show provocation to support a charge on voluntary manslaughter was present.").

Second, even if a jury could infer from the evidence that Mobley was actually provoked into a sudden, violent, and irresistible passion by being shot by Katelyn after they argued and she refused to let him into her home to see their children, Katelyn's conduct would not be sufficient to excite such a passion in a *reasonable* person. Even accepting as true Mobley's testimony that he did not break into Katelyn's home, he knew that he had entered her home without permission and in violation of a no-contact court order, and

11

he ignored her demand that he leave. Under such circumstances a reasonable person would not be provoked by the victim's use of force in defense of self and habitation. See *Johnson v. State*, 313 Ga. 698, 700 (___ SE2d ___) (2022) (A shooting victim's "physical[ ] resist[ance against the defendant's] unlawful act . . . is not the type of provocation which demands a voluntary manslaughter charge." (citation and punctuation omitted)); *Ros v. State*, 279 Ga. 604, 608 (6) (619 SE2d 644) (2005) ("[T]he victim's behavior in defending himself from [an] unprovoked attack" did not constitute "the evidence of passion or provocation needed to authorize a charge on voluntary manslaughter."); *Nance v. State*, 272 Ga. 217, 221 (3) (526 SE2d 560) (2000) ("[A] voluntary manslaughter charge is not warranted when the only alleged evidence of provocation is the victim resisting an armed robbery."); *Turpin v. Christenson*, 269 Ga. 226, 234 (12) (A) n.6 (497 SE2d 216) (1998) (A voluntary manslaughter charge was not warranted where "[t]he trial evidence and the available information showed that [the defendant] initiated an armed robbery by pointing a gun at the victim, without

12

provocation, and then killed the victim when he resisted" the robbery.).

Absent any evidence of a specific provocation at or close to the time of the homicide that would generate in a reasonable person a sudden and irresistible passion to kill, the trial court did not err in declining Mobley's request for a voluntary manslaughter instruction. See *Johnson*, 313 Ga. at 700; *Ros*, 279 Ga. at 608 (6); *Nance*, 272 Ga. at 221 (3).

*Judgment affirmed. All the Justices concur.*

Decided June 22, 2022.

Murder. Walton Superior Court. Before Judge Ott.

*Leslie S. Jones, Anthony S. Carter*, for appellant.

*Randal M. McGinley, District Attorney, David C. Williamson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.

13