**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 25-11890

Oral Argument Calendar

————————————

MICHAEL WADE NANCE,

*Plaintiff-Appellant,*

*versus*

COMMISSIONER, GEORGIA DEPARTMENT OF
CORRECTIONS,
WARDEN, GEORGIA DIAGNOSTIC AND CLASSIFICATION
PRISON,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-00107-JPB

————————————

Before WILLIAM PRYOR, Chief Judge, and NEWSOM and LAGOA, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the district court erred in rejecting a prisoner's complaint that his execution by lethal injection would violate the Eighth and Fourteenth Amendments to the Constitution. *See* 42 U.S.C. § 1983. Michael Nance, a Georgia prisoner sentenced to death, sued prison officials on the ground that there was a substantial likelihood he would suffer severe pain during his execution by pentobarbital. He alleged that his veins were so compromised that the execution team would not be able to establish intravenous access and that his veins would blow even if access were possible. The prison officials' medical expert examined Nance's veins the morning of the bench trial and testified that access would not be difficult, and four members of the execution team testified remotely and anonymously. The district court ruled that Nance failed to prove a substantial likelihood that he would suffer severe pain based on his medical records. Nance complains that the district court misapplied the law, committed clear errors in its findings of fact, and erred by allowing the officials' expert to testify about his examination the morning of trial and by allowing the execution team to testify remotely. Because the district court committed no reversible error, we affirm.

## I.  BACKGROUND

Since 2012, the Georgia lethal-injection protocol has required that at least one physician be present "to provide medical assistance during the execution process," two or more "trained personnel, including at least one . . . Nurse," be present "to provide

intravenous access," and three "trained staff members" be present to "inject solutions into the intravenous port(s) during the execution process." When the condemned prisoner arrives to the execution chamber, the execution team "provide[s] two . . . intravenous accesses," and "[i]f the veins are such that intravenous access cannot be provided, a Physician will provide access by central venous cannulation or other medically approved alternative." Two members of the injection team each inject one syringe of 2.5 grams of pentobarbital, one after the other, and a third member injects a syringe of saline to "ensur[e] a steady . . . flow." The "IV Nurse will monitor the progress," and if he "observes a problem with intravenous flow, [he] will inform the attending Physician, who will inform the Warden as to whether or not using an alternative . . . is appropriate." The warden is tasked with "giv[ing] the . . . instructions to the Injection Team." If the prisoner still exhibits signs of life afterward, the injection team will administer five more grams of pentobarbital.

In 1993, Michael Nance murdered Gabor Balogh by shooting him at point blank while stealing his car to a flee a bank robbery. *Nance v. State*, 526 S.E.2d 560, 563–64 (Ga. 2000). Four years later, a jury found Nance guilty of capital murder, and a trial court sentenced him to death. *Id.* at 563 n.1.

Twenty-two years after his conviction, Nance sued the Commissioner of the Georgia Department of Corrections and a prison warden on the ground that his execution by lethal injection would violate the prohibition of cruel and unusual punishments

under the Eighth and Fourteenth Amendments, *see* 42 U.S.C. § 1983, and he sought an injunction against his execution by lethal injection. His complaint alleged that "execution by a firing squad" was a "feasible and readily implemented" alternative.

We initially rejected his suit as a second or successive habeas petition, *Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1214 (11th Cir. 2020), but the Supreme Court reversed in a 5-4 decision. It held that the suit could proceed under section 1983. *Nance v. Ward*, 142 S. Ct. 2214, 2221 (2022). On remand, we held that Nance's as-applied claims were timely. *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1153–54 (11th Cir. 2023).

In an amended complaint, Nance alleged that his "veins are severely compromised[,]. . . heavily scarred, tortuous, and have thin walls." He alleged that "[i]nsertion of an intravenous catheter . . . present[ed] a substantial risk that [his] vein will 'blow' and lose its structural integrity, causing the injected pentobarbital to leak into the surrounding tissue"—an "intense and painful" "leakage" called "extravasation." He also alleged that the members of the execution team "lack[ed] the professional skills" to perform the protocol's alternative intravenous access to peripheral vein access: either "central venous cannulation or a cutdown." Nance alleged that execution by firing squad provided a "feasible and readily implemented" alternative, and because it was "both swift and virtually painless," lethal injection would entail a "cruel superaddition of terror and pain."

Dr. Joseph Antognini provided an expert report for the prison officials. His report stated that, in the light of Nance's "several recent medical procedures that required intravenous access" for which "[t]here were no reports of difficulty," "there should not be difficulty in obtaining access for [Nance's] execution." In a later deposition, Dr. Antognini testified that he had never examined Nance and that he based his opinion on the report of Nance's expert and Nance's medical records.

Nance stated that he intended to call as witnesses at trial members of the execution team whose names had been kept anonymous. But the prison officials proposed that the team members testify remotely without appearing on camera and with voice modulating software. Nance rejected that proposal, so the prison officials requested that the district court impose those security measures.

Under the Georgia Secrecy Act, "[t]he identifying information of any person or entity who participates in or administers the execution of a death sentence . . . shall be confidential." GA. CODE ANN. § 42-5-36(d)(2). The prison officials explained that, under the Act, they "must do everything possible to ensure [the team members'] identities remain a secret." They offered to have Bryan Wilson, deputy general counsel for the Department, "be with the witness and attest that the witness is the individual . . . subpoenaed to testify," after which Wilson would leave, the witness would be left alone, and "the video and audio feed w[ould] be broadcast to the courtroom." Nance objected and proposed alternatives. But the

district court ruled that the anonymous witnesses could testify by contemporaneous transmission without appearing on camera and while using voice modulation software. It found that the need to protect the witnesses' identities outweighed any difficulty in "evaluating the[ir] credibility."

Before trial, the prison officials informed Nance that they wanted Dr. Antognini to examine Nance's veins either the day before or the morning of trial and to testify about his observations. The district court ruled that Dr. Antognini could examine Nance the morning of trial. Nance moved to exclude Dr. Antognini's testimony about the examination as violating the deadline for expert disclosures. The district court denied Nance's motion but allowed him to interview Dr. Antognini before he testified. It also gave Nance the opportunity to request a "follow-up report" by his expert or a "follow-up deposition" of Dr. Antognini after the interview. After the interview, Nance told the district court that "any further deposition[s] or reports will [not] be necessary."

Before calling witnesses, the parties agreed to admit three of Nance's medical records accompanied by declarations of medical professionals who reviewed them. The first declaration came from a doctor who reviewed records of Nance's December 2022 computed tomography scan. She explained that the records established that the contrast agent "injected into an intravenous . . . line" was "delivered throughout . . . Nance's circulatory system," leading her to believe there were no "concerns" or "problems" with its deliv-

ery. The second declaration came from a registered nurse who sedated Nance for his February 2022 colonoscopy. She stated that intravenous "access was established" in Nance's left arm "with a 20 or 22 gauge needle and a catheter," and there was no "redness, swelling or pain at the injection site." The third declaration came from a doctor who reviewed the magnetic resonance records of Nance's February 2023 brain scan. He stated that the contrast agent injected intravenously was delivered without issue.

At trial, Nance's expert, Dr. David Waisel, testified based on the condition of Nance's veins that establishing intravenous access "will likely require multiple painful needle insertions to locate a suitable vein." He stated there was a "substantial risk that [Nance's] veins will lose their structural integrity and blow," which will cause "intense pain and burning in . . . surrounding tissue" and a "prolonged execution . . . [with] excruciating pain." Dr. Waisel stated that Nance's medical records lacked "basic core information" like the "number of attempts, the size of the catheters used, . . . and . . . any problems with" intravenous access.

Dr. Antognini testified for the prison officials about his examination of Nance. He stated that in the light of the blood "drain[ing] out of [Nance's] veins," "[h]is veins looked very good" and without scar. He explained that the medical records established that "venous access should not be an issue."

Four members of the execution team testified anonymously from a remote location: a corrections officer who injects the pen-

tobarbital, the nurse who establishes intravenous access, the physician for the execution, and the physician who examines the prisoner before the execution. None used voice modulation software, and three eventually consented to having their faces visible only to the district court. Wilson attested to their identities. And the district court and Nance's counsel ensured they were alone during their testimony without access to electronics.

The district court entered judgment for the officials. It found that "the condition of [Nance's] veins [does not] make[] it unlikely that the execution team will be able to obtain a peripheral IV." It ruled that "[i]n light of [Nance's] recent medical history, . . . [Nance] failed to show by a preponderance of the evidence that his veins are so compromised that it is substantially likely that the execution team would be unable to obtain peripheral IVs." Moreover, Nance "failed to show that once peripheral IV access is obtained, . . . it is substantially likely that complications would arise causing him severe pain." The district court based its decision on Nance's medical records. Nance later moved to alter or amend the judgment, and the district court denied his motion.

## II.  STANDARDS OF REVIEW

"In reviewing a judgment following a bench trial, we review *de novo* both conclusions of law and the application of the law to the facts," and "we review findings of fact for clear error." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 921 (11th Cir. 2023). "We will not find clear error unless our review of the

record leaves us with the definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted). We review "evidentiary rulings for abuse of discretion." *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1309 (11th Cir. 2023) (citation and internal quotation marks omitted). "An error is harmless unless it affects the substantial rights of the parties such that the reviewing court cannot confidently say that the judgment was not substantially swayed by the error." *Id.* (citation and internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion into three parts. We first explain that the district court was not required to determine whether Nance established a readily available and feasible alternative. We next explain that the judgment does not rest on clearly erroneous facts. Finally, we explain that no evidentiary error was prejudicial.

### A. The District Court Was Not Obliged to Decide Whether Nance Established a Readily Available Alternative.

Nance contends that "[d]etermining the constitutionality of an execution method *requires* the trial court to *compare* the State's proposed method with the condemned plaintiff's proposed alternative." But we disagree. Nance misreads the controlling precedents.

We have explained that "to prevail on" a method-of-execution claim, a prisoner "has to establish two things: (1) that the method of execution in question creates a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for

purposes of the Eighth Amendment, and (2) that there is an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Barber v. Governor of Ala.*, 73 F.4th 1306, 1318 (11th Cir. 2023) (alteration adopted) (citation and internal quotation marks omitted). In *Barber*, we concluded that even though the prisoner "identified a feasible alternative method of execution," he had "not show[n] that he face[d] a substantial risk of serious harm if executed by" the planned method. *Id*. at 1318–19 (internal quotation marks omitted). If the planned method does not present a substantial risk of serious harm, the officials may use it regardless of the proposed alternatives.

Our precedent faithfully adheres to Supreme Court precedent. In *Bucklew v. Precythe*, the Court explained that "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." 139 S. Ct. 1112, 1125 (2019). An "alternative method" cannot "reduce a substantial risk of severe pain" when there was no substantial risk in the first place.

Nance points to the language in *Bucklew* that "[t]he Eighth Amendment does not come into play unless the risk of pain associated with the State's method is substantial *when compared to* a known and available alternative." *Id*. (emphasis added) (citation and internal quotation marks omitted). But that passage means only that where the risk from the planned method is like the alternative, the "Eighth Amendment does not come into play"—not

that the Eighth Amendment "come[s] into play" where there is *no* substantial risk. And when *Bucklew* called the adjudication a "necessarily comparative exercise," *id*. at 1126 (emphasis omitted), as it "always involve[s] a comparison with available alternatives," *id*. at 1127, it did so in rejecting a prisoner's argument that he "should not have to prove an alternative method of execution in his as-applied challenge," *id*. at 1126. In other words, comparison will always be necessary to sustain a prisoner's claim, not to *reject* one.

B.  *The District Court Made No Clear Error in Its Fact Findings.*

Nance contends that the judgment of the district court rests on clearly erroneous findings of fact. But we disagree. Nance's medical records alone make the findings "permissible." *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). Medical professionals obtained peripheral access to Nance's veins three times less than two and a half years before the trial, and the medical records reveal no complications in either obtaining intravenous access or delivering a steady flow of fluids into his veins. For his computed tomography and magnetic resonance scans, the reviewing doctors attested that "[i]f there had been problems with the delivery . . . [it] would have been evident" in the respective "scan images." And the nurse who sedated Nance for his colonoscopy confirmed that there was "no redness, swelling or pain" at the intravenous access point—a fact even Dr. Waisel conceded "suggest[ed] . . . that there was no extravasation during th[e] procedure."

Nance responds that the medical records are "of limited utility" because, as Dr. Waisel explained, they do not state "the 'number of . . . attempts, . . . the size of catheters successfully inserted and [whether there] were . . . any problems with [access].'" Yet Dr. Waisel also admitted that there was "nothing in the[] medical records suggesting . . . that it took more than one time to get IV access." To be sure, Dr. Waisel testified that injections are more difficult with a "smaller needle." But the medical staff performing Nance's colonoscopy used a "20 or 22 gauge needle" to establish intravenous access, and the prison officials plan to use a larger or same-size needle.

The district court was also entitled to credit Dr. Antognini's testimony that had there been a significant number of failed attempts to establish access, the medical records would have likely reflected it. What Nance calls "an absence of *documented* complications" the district court permissibly treated as "a documentation of absence." For that reason, it does not matter that the declarants who reviewed the scan records were "not . . . present for the procedure."

### C. *The Evidentiary Rulings Involve No Reversible Error.*

Nance argues that the district court erred in two evidentiary rulings. First, he maintains that allowing Dr. Antognini to examine him the morning of trial and to testify about the results of the examination was error because it violated the expert disclosure schedule. Second, Nance argues that permitting the execution

team members to "testify anonymously, remotely, without cameras on, and under the supervision of another defense witness" violated the preference for in-court testimony reflected in Federal Rule of Civil Procedure 43. But neither ruling, even if erroneous, prejudiced Nance.

The district court did not rely on either Dr. Antognini's testimony about his examination or the anonymous testimonies of the execution team. The district court found that Nance's medical records alone made it likely that the execution team would be able to obtain peripheral access and that complications causing severe pain would not arise. Indeed, the district court did not refer to *any* of Dr. Antognini's testimony in its conclusions of law, where it reviewed the merits of Nance's complaint. And where it referred to the execution team's testimony, it did so to make alternative findings that "[i]f a complication occurred, . . . [the execution team] would be able to detect it and address it" and "alternative IV access methods" would be successful.

Contrary to Nance's argument, we may "disentangle . . . [alleged] improperly introduced testimony from the rest of the court's findings," because the district court explained its analysis step-by-step. True, the district court quoted Dr. Antognini's testimony about his examination in its findings of fact. But it did so only descriptively—in other words, the district court explained what Dr. Antognini said without crediting his testimony. The district court similarly recounted Dr. Waisel's testimony in the same section. In

any event, even if the district court relied on Dr. Antognini's testimony about his examination, Nance waived any error by declining the district court's offer to allow Nance to depose Dr. Antognini and to offer a rebuttal report. *See Gould v. Interface, Inc.*, 153 F.4th 1346, 1353 (11th Cir. 2025) ("Waiver is the intentional relinquishment . . . of a known right." (citation and internal quotation marks omitted)). And although the district court stated that it was "[i]mportant[]" that the anonymous execution physician was "confident" that the staff would be able to "identify and correct any issues with the IV tubing," it was only "important" to the alternative ruling that an *unlikely* complication would not have posed a problem.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the prison officials.